[Nos. 24520, 24521. Department One. July 25, 1933.]

H. McBRIDE, *Appellant*, v. H. E. CALLAHAN *et al.*, *Respondents*.

H. E. CALLAHAN *et al.*, *Respondents*, v. H. McBRIDE *et al.*, *Appellants*.[1]

[1]Reported in 24 P. (2d) 105.

*Caldwell & Lycette,* for appellant McBride.

*William H. Brinker* and *Caldwell & Lycette,* for appellant National Surety Co.

*Dwinell & McCoy* and *W. H. Sibbald,* for respondents.

MILLARD, J.—On January 12, 1931, H. McBride entered into a written contract with Cowlitz county for clearing and grubbing, in accordance with the plans and specifications attached to the contract, the right of way for a highway known as the Spirit Lake road. The specifications read as follows:

"The right of way shall be cleared and grubbed to a width of forty (40) feet, twenty (20) feet on each side of the center line. Clearing will in all cases conform to the stakes set by the Engineer.

"Clearing. Within the lines staked by the Engineer, all trees, brush, logs and down trees with a diameter of less than nine (9) inches, and other organic matter shall be removed and burned within the right of way. Trees greater than nine (9) inches in diameter shall be cut into lengths of not less than thirty-two (32) feet and decked outside the right of way limits, all limbs and tops being burned on the right of way.

"Grubbing. Within the lines staked by the Engineer, all stumps and roots embedded in the ground shall be removed and piled outside the right of way limits. Burning of same will not be required.

"Area to be cleared and grubbed. The area to be cleared and grubbed under this contract is 36.3 acres."

The National Surety Company was surety upon McBride's bond. Between January 12th and February 19th, McBride had a crew engaged in the work of clearing and grubbing the right of way for the road. On February 19, 1931, McBride entered into a written contract with H. E. Callahan and Harry F. Fleetwood, who had commenced that work a few days prior to the signing of the contract, for the clearing and grubbing. Fleetwood was forty years old, and had been engaged in the logging industry practically all of his life. Callahan had been engaged in logging and woods work for ten to fifteen years. Both testified they were experienced in the character of work required under their contract, which they read before signing. They also visited the site of the proposed improvement prior to signing the contract. The Royal Indemnity Company was surety upon the bond of the copartners Callahan and Fleetwood.

The subcontract provides that the copartners shall perform the work of clearing and grubbing in accordance with the specifications "hereinbelow set out" and to the satisfaction of the county engineer. Paragraph 1 of the specifications provides that the right of way, as staked by the engineer, "shall be cleared and grubbed ready for grading." The second and third paragraphs of the specifications read as follows:

"(2) All logs, whether down or standing, at present on said right of way within the lines established by the Engineer shall be piled and decked clear of said right of way, to the satisfaction of the County Engineer; all other organic matter shall be removed and cleaned up from said right of way, to the satisfaction of the Engineer in charge. All stumps, roots, whether imbedded in the ground or not, shall be grubbed and removed and cleared and cleaned from the right of way, to the satisfaction of the Engineer in charge. The area to be cleared and grubbed under this contract is approximately thirty-six (36) acres.

"(3)   Said work of the second parties shall leave the right of way ready for grading."

Paragraph 6 provides that the subcontractors shall pursue the work with all diligence, and that, if the subcontractors fail to pursue the work diligently, McBride "may and he hereby reserves the right to take charge of said work" and finish it at the expense of the subcontractors. The subcontractors (both so testified) continued on the job under their written contract with McBride until April 15, 1931. On that date, being dissatisfied with the progress made by the subcontractors, McBride took over the work and completed it.

McBride instituted an action in King county against subcontractors Callahan and Fleetwood and their surety to recover expense undergone by him on account of defendants' breach of the subcontract. McBride's complaint, in the first cause of action, alleged (paragraph I) that McBride entered into a certain road contract with Cowlitz county; that (paragraph II) McBride entered into a written subcontract with Callahan and Fleetwood, and that a copy of the subcontract was attached to and made a part of the complaint; and that (paragraph III) the subcontractors commenced performance of the subcontract, but wholly failed, refused and neglected to finish the work; that McBride was compelled to complete the work at his own expense, and was, in addition, forced to pay many lien claims incurred by the subcontractors, all to his damage in the amount of thirteen thousand dollars.

In their answer, the defendants admit, without qualification, paragraphs I and II and deny paragraph III of the complaint. McBride's second cause of action is particularly against the surety on the subcontractors' bond. It realleges the same facts as the first cause of action. No affirmative defenses were pleaded by

either of the defendants. Defendants did not allege that the contract, which they admitted they had made with plaintiff, was impossible of performance, that it was rescinded, abandoned or modified.

Thereafter, the copartnership of Callahan and Fleetwood commenced an action in Cowlitz county against McBride and the surety on his bond to recover for services performed in clearing and grubbing Spirit Lake road. The complaint alleged (paragraph III) that, in January, 1931, McBride entered into a contract with Cowlitz county to clear and grub Spirit Lake road, and that the National Surety Company was surety on McBride's bond; and that (paragraph IV), during the months of February, March, April and May, 1931, the plaintiffs, pursuant to oral agreement with McBride, performed labor and services in clearing and grubbing the right of way, at an agreed and reasonable value of an amount stated.

Answering, defendants denied paragraph IV of the complaint, alleged that another and prior action was pending between the same parties for the same cause as alleged in the complaint; and, as an affirmative defense, alleged: That, after entering into the contract with Cowlitz county, McBride entered into a subcontract on February 19, 1931, with Callahan and Fleetwood, and that a copy of the subcontract was attached to the answer; that (paragraph III of the affirmative defense), as alleged in paragraph III of McBride's complaint in the action against the subcontractors and their surety, McBride was damnified in the amount of thirteen thousand dollars by reason of the subcontractors' breach of the subcontract, etc.

Plaintiffs replied as follows:

"Come now the plaintiffs and for their reply to the answer of the defendants herein admit the execution of the instrument set forth as exhibit 'A' and such fur-

ther matter as is specifically admitted, qualified or explained in the complaint and except as so admitted, deny said answer and the whole thereof.''

In the second action, the subcontractors admitted the execution of the written subcontract. They did not allege, in defense of nonperformance, impossibility of performance, rescission or abandonment. McBride's action was transferred to Cowlitz county and consolidated for trial with the subcontractors' action against McBride.

The consolidated causes were tried to the court, which found, in the action instituted by the subcontractors, that, on January 13, 1931, Cowlitz county entered into a contract with McBride for the clearing and grubbing of Spirit Lake road, and

''That during the month of February, 1931, defendant McBride entered into a written agreement with the plaintiffs by which the plaintiffs agreed to do certain work upon the right of way for a stated consideration and thereafter went upon the ground and almost immediately thereafter it was found by the plaintiffs that the work agreed upon in said written contract between the parties hereto was impossible of performance; which fact was at all times known to defendant McBride, and that thereupon the plaintiffs herein continued to operate in said work by carrying on the work under oral instructions from the defendant McBride, his agents and employees, and without any stated consideration therefor and that during the months of February, March, April and May of the year 1931, the plaintiffs performed labor and services and furnished labor, provisions, machines, and supplies for the carrying on of said work, to-wit: the construction of said right of way, of the reasonable value of $4,145.46.''

The court also found that of the amount due $1,521.71 had been paid by McBride to the subcontractors. Judgment was entered against McBride and

his surety in favor of plaintiff subcontractors for the balance found to be due.

In the action of McBride against the subcontractors and their surety, the court found that Callahan and Fleetwood entered into the written contract in question with McBride in February, 1931, and that thereafter they

" . . . attempted to perform their said contract and it was immediately discovered that the same was impossible of performance by reason of the fact that it called for the piling of stumps, logs and other material off the right of way upon the adjoining land owned by the Weyerhaeuser Timber Company; that said Weyerhaeuser Timber Company and said Cowlitz county objected to the piling of said material off the right of way on said land and stopped the same immediately and that at no time could the said contract between the plaintiff McBride and defendants Callahan and Fleetwood have been carried out, all of which was well known to this plaintiff.

"That in and by reason of the premises said contract between this plaintiff and defendants Callahan and Fleetwood never became operative and was at all times null and void and the bond . . . never became a valid obligation as against defendant Royal Indemnity Company."

Judgment was entered dismissing the action of McBride against the subcontractors and their surety, from which judgment plaintiff McBride has appealed. From the judgment in the other action, defendants McBride and surety have appealed.

There is no basis in the pleadings for the theory upon which the trial court found in favor of the respondents.

The trial court found that the subcontractors

. " . . . attempted to perform their said contract and it was immediately discovered that the same was impossible of performance by reason of the fact that it called for the piling of stumps, logs and other ma-

terial off the right of way upon the adjoining land owned by the Weyerhaeuser Timber Company; that said Weyerhaeuser Timber Company and said Cowlitz county objected to the piling of said material off the right of way on said land and stopped the same immediately, and that at no time could the said contract between the plaintiff McBride and the defendants Callahan and Fleetwood have been carried out."

The court further found that, under oral instructions from McBride and without any stated consideration for their services, the subcontractors "continued to operate in said work," and that, during the months of February, March, April and May of the year 1931, they performed labor and services and furnished supplies, etc., for carrying on the work of clearing and grubbing the right of way "of the reasonable value of $4,145.46."

No issues were framed under which the respondent subcontractors could recover on the trial court's theory—impossibility of performance was not pleaded, and there was no allegation of modification of the written subcontract which respondent subcontractors admitted they made with McBride. Under the pleadings, McBride was entitled to recovery against the subcontractors and their surety.

In McBride's complaint, he alleged that he entered into a contract (described above) with Cowlitz county; that he entered into a written subcontract (described above) with Callahan and Fleetwood; and that subcontractors Callahan and Fleetwood commenced, but failed and neglected to complete, performance of the work under that subcontract. The subcontractors by their answer admitted that McBride entered into the contract with Cowlitz county and that they entered into the written subcontract with McBride, but denied that they failed to perform the work required under

the subcontract. No affirmative defenses were pleaded by the subcontractors.

The subcontractors, in their action against McBride and his surety, alleged that during the months of February, March, April and May, 1931, at the oral request of McBride, they performed labor in carrying on the clearing and grubbing work of the agreed and reasonable value of $6,419. That was denied in the answer of McBride, who, by affirmative answer and cross-complaint, alleged, as in the complaint in his action against the subcontractors, the execution of the contract with Cowlitz county, the making of the subcontract with the subcontractors, and their failure to perform the subcontract. By their reply, the subcontractors and their surety admitted the execution of the subcontract

" . . . and such further matter as is specifically admitted, qualified, or explained in the complaint, and except as so admitted, deny said answer and the whole thereof."

It will be noted that, in this action, as in the other, the subcontractors admitted that they entered into the written subcontract with McBride, but nowhere in the pleadings is aught alleged in defense of their failure to perform the contract. The only issue in each cause was whether the subcontractors performed the written subcontract which they admitted they made with McBride.

The pleadings were not amended. Counsel for appellants promptly objected to any suggestion during the trial that the subcontract was impossible of performance by reason of the fact that the county engineer and the Weyerhaeuser Timber Company, as the trial court found, "objected to the piling of said material off the right of way" onto the Weyerhaeuser Timber Company's land. Such evidence was not within the

only issue presented by the pleadings. In *Osten v. Winehill,* 10 Wash. 333, 38 Pac. 1123, the complaint was founded on a *quantum meruit,* as in the case at bar. The answer alleged, as in the case at bar, that the work was performed under a written contract. The reply, as in the case at bar, admitted the terms of the written contract. However, in the case cited, it was alleged that performance was made impossible by the defendant, while in the case at bar the respondents did not so plead. In holding that the defendants' motion for a nonsuit should have been sustained, we said:

"If the plaintiff's damages arose from the violation of a written contract, they are not only required by the statute to allege that fact, but fair dealing also requires them to allege it, so that the defendants need not grope in the dark or be compelled to frame their answer or go to trial upon the hazard of a guess."

Our holding in that case is stated in the syllabus as follows:

"Where the complaint in an action is founded on a *quantum meruit* for labor performed and materials furnished for defendant, and the answer sets up that the work was done under a written contract, the terms of which are set forth, a reply admitting the terms of the contract and that the work was to be done for a stipulated price, but alleging that plaintiff was prevented from fulfilling his contract by the failure of defendant to perform conditions thereof on his part, constitutes such a departure in pleading as to warrant a non-suit.

"Where defendant has objected to the introduction of evidence on account of a departure in plaintiff's pleadings and has afterwards moved for a non-suit, he has thereby saved his right to urge the error on appeal, although he has failed to move for judgment on the pleadings."

In *Clemmons v. McGeer,* 63 Wash. 446, 115 Pac. 1081, which is to the same effect, we said:

"It has become the settled law of this state, in keeping with the general rule elsewhere, that a plaintiff cannot, over the objections of his adversary, by any pleadings subsequent to his complaint, bring into the action for adjudication any cause of action different from that set forth in his complaint. *Distler v. Dabney*, 3 Wash. 200, 28 Pac. 335; *Bell v. Waudby*, 4 Wash. 743, 31 Pac. 18; *Clark v. Sherman*, 5 Wash. 681, 32 Pac. 771; *Osten v. Winehill*, 10 Wash. 333, 38 Pac. 1123; *Gile v. Baseel*, 38 Wash. 212, 80 Pac. 437; *Smart v. Burquoin*, 51 Wash. 274, 98 Pac. 666; *Spokane Grain Co. v. Great Northern Express Co.*, 55 Wash. 545, 104 Pac. 794. The rule is stated in 6 Ency. Plead. & Prac., p. 461, as follows:

" 'A plaintiff in an action must recover, if at all, upon the cause of action stated in his declaration or complaint, and a replication or reply that sets up a different cause of action from that declared on is bad for departure. The office of a replication or reply is to meet the allegations of the plea or answer, and it cannot, in ordinary cases, introduce, as a basis for affirmative relief, matter enlarging the grounds upon which recovery was originally sought. This can be done only by amendment of the original pleading.' "

In *Gile v. Baseel*, 38 Wash. 212, 80 Pac. 437, an action to enjoin the operation of a fish trap, the complaint alleged that the defendant's location was an unlawful encroachment because it was within the lateral passageway of plaintiff's fish traps. The reply admitted that the defendant's trap as remodeled was not within plaintiff's lateral passageway, but alleged that it was within the lateral passageway of a trap owned by one L, and was a public nuisance, especially injurious to plaintiff because it stopped and caught fish which otherwise his traps would catch. In holding that the reply was inconsistent with the complaint and constituted a departure, we said:

"If the reply be true, the change gave rise to a new cause of action in favor of the appellant against the

respondent—a cause of action based on a different state of facts, and different principles of law, from that stated in the complaint. In other words, the reply not only attempted to enlarge the scope of the original complaint, but to change the nature of the action, and this we have held is not the office of a reply. *Distler v. Dabney,* 3 Wash. 200, 28 Pac. 335; *Bell v. Waudby,* 4 Wash. 743, 38 Pac. 18; *Osten v. Winehill,* 10 Wash. 333, 38 Pac. 1123. It may be that, had the appellant asked it, it would have been within the discretion of the trial court to have allowed the new matter to be incorporated in an amended or supplemental complaint, but this was the extent of the appellant's rights.''

The subcontractors admitted that they made the subcontract with McBride. They denied failure to perform that contract. The trial court found, and the respondents contend in this court, that the contract was impossible of performance. The respondents failed to plead impossibility of performance of the contract. Matter absolving the subcontractors from liability for non-performance of the contract was not incorporated in an amended or supplemental complaint; permission so to do was not requested. The defense of impossibility of performance is not, under the pleadings, properly before us.

The evidence does not preponderantly support the finding that the written subcontract was impossible of performance and was superseded by an oral agreement under which the subcontractors worked during February, March, April and May, 1931. The argument, as follows, in this court of counsel for respondents as to the readiness, ability and willingness of the subcontractors to perform the work required under the terms of the written subcontract, is hardly consistent with their contention and the finding of the trial court that the subcontract was impossible of performance:

"Fourth, there was no time limit specified in the subcontract within which performance thereof must be completed. Although a clause limiting the time for performance of the contract had originally been written into it, such clause was expunged from the contract at the instance of the Royal Indemnity Company. The only requirement was that Callahan and Fleetwood should work steadily and diligently and in good faith to perform the contract. This they did until they were denied the right to proceed further with it. Callahan and Fleetwood at all times were ready, able and willing to perform under the terms of their contract and did so until stopped through no fault of their own."

The evidence is overwhelming that the subcontract was possible of performance; that the subcontract was taken over April 15, 1931, and completed by McBride under a provision of the subcontract authorizing him so to do if, in his or the county engineer's opinion, the subcontractors "are not making sufficient progress or showing sufficient diligence to complete said work in a reasonable time;" and that, from February up to April 15, 1931, when McBride took charge of the work, the subcontractors were working under the written subcontract.

The subcontractors testified repeatedly, and their counsel in effect admitted, that they continued work under their written contract up to the time (April 15, 1931) that McBride put them off the work because they were not making sufficient progress. This establishes the fact, contrary to the trial court's finding, that the contract was possible of performance.

Subcontractor Callahan testified:

"Q. Had you an agreement with Mr. McBride that he was to take over that equipment prior to April 15th? A. No, I did not. Q. Had no understanding at all prior to April 15th? A. No, sir. . . . Q. When did Mr. McBride shut you down? A. On taking it over on the 15th of April. Q. Had you any conversa-

tion with him prior to that time about taking your contract over? A. No, sir. Q. Up to that time you considered you had been working under your contract? A. Under the contract, yes, as far as we could. . . . Q. And when did Mr. McBride take charge of that crew? A. He took charge about the 15th of April. Q. He took charge about the 15th of April? Prior to that time you handled it yourself, did you? A. Yes. Q. You and Mr. Fleetwood? A. Yes. . . . Q. Did you have any other contract besides this one? A. No, sir. Q. Either written or otherwise? A. No, sir. . . . THE COURT: When did you say Mr. McBride took it over? A. The 15th of April. . . . Q. After you had proceeded the first mile, how long did you continue in charge of it—you had charge of it or Mr. Fleetwood? A. To the 15th of April. Q. Did you or Mr. Fleetwood manage the operations? A. Mr. Fleetwood started with it, and I had it on the last part of the contract. . . . Q. Did you have any agreement with him (McBride) as to what you were to receive? A. For what? Q. Anything excepting the written contract? A. No, sir."

Callahan and Fleetwood testified that, in the latter part of March or the first part of April, they made two subcontracts with other men for doing work that they (the copartners) had contracted to do for McBride.

One of respondents' counsel admitted that the subcontractors were performing the work under their written subcontract until April 15th; he said:

"We will admit it rather than take up the time of the court to prove that McBride took over on the 14th of April the entire charge of all the work."

In making objection to certain expenditures prior to April 15th, as to which McBride was testifying, counsel for respondents insisted that McBride had not taken over the work until April 15th. The colloquy was as follows:

"By counsel for defendants (Mr. Sibbald): You had not taken the job over yet, and we did not bring

our own men, and he was not one of our own men. THE COURT: Are you contending that you hired your own men to do this until April 15th? Counsel for defendants: Until April 15th we hired our own men, we had our own working force up there until that time. We kept our crew up there, doing work as it was then said it had to be done."

Fleetwood testified that, other than as provided by the written subcontract, he and Callahan had no other agreement with McBride; that, pursuant to instructions from their surety and in order to protect their surety bond, they stayed on the job until April 14th, when they (Callahan and Fleetwood) "voluntarily surrendered the job? A. Yes, sir, on April 14th."

The testimony of McBride and his superintendent was to the effect that the subcontractors operated under the written subcontract until April 15th, when McBride was compelled to put the subcontractors off the work in order to satisfy the county engineer, who was complaining that the work was not being carried on diligently. There are only isolated items of testimony—statements by the subcontractors—that Callahan and Fleetwood thought they were not working under the written subcontract, to lend color to the finding of the trial court. However, the emphatic and repeated statements of Callahan and Fleetwood that they worked under their written subcontract until removed from the job on April 15th, together with the statements of their counsel during the trial, overcome any inferences contrary thereto.

The progress of the subcontractors—they completed up to April 15th approximately one-third of the work under their contract—was not satisfactory to the county or to McBride. In removing the subcontractors, McBride exercised a right reserved to him by the terms of the subcontract. The contract was not im-

possible of performance. The contract did not provide, nor were the subcontractors required, as they contend and as the court found, to pile stumps, logs and other material off the right of way upon the adjoining land owned by the Weyerhaeuser Timber Company. The court found that the refusal of the timber company to permit such disposition of the stumps, logs, etc., constituted impossibility of performance.

The subcontract required the subcontractors to do all that was necessary to leave the right of way cleared and grubbed ready for grading. Paragraph 2 of the specifications provides:

"All logs, whether down or standing, at present on said right of way within the lines established by the engineer shall be piled and decked clear of said right of way, to the satisfaction of the County Engineer;"

that is, the subcontractors were not only permitted, but were required, to pile the logs alongside on the Weyerhaeuser land. The term "logs" meant merchantable logs; that is, logs not less than nine inches by thirty-two feet. It is so conceded, as follows, in respondents' brief:

" . . . the logs, and by that it is conceded that the contract means merchantable logs with a diameter of not less than 9 inches and 32 feet in length . . ."

Weyerhaeuser owned the land through which the road ran. That company sold the right of way to the county, reserving the merchantable timber which had to be piled and decked clear of the right of way so that Weyerhaeuser could use it. The subcontractors piled the logs, stumps, windfalls all in one pile on the land of Weyerhaeuser. They were required to rectify that mistake by separating the material into piles of merchantable logs (9"x32') and piles of rubbish. The subcontractors were required to pull back onto the right of way some of the objectionable material. They were

advised that, on account of the fire hazard, the rubbish could not be dumped on the Weyerhaeuser land, hence that material had to be burned on the right of way or other disposition made of it. There is no dispute about the requirement as to the merchantable logs.

Let us continue to quote from paragraph 2 of the specifications:

"All other organic matter shall be removed and cleaned up from said right of way, to the satisfaction of the Engineer in charge."

So far, the specifications are clear. The subcontractors are required (1) to pile the logs off the right of way (that was done), and (2) to remove and clean up from the right of way all other organic material. Such removal could be accomplished by burning or hauling the material to some other point or disposed of in any manner that was satisfactory to the engineer in charge. There can not be read into this contract the requirement, as respondents argue, that the subcontractors remove all other organic matter from the right of way "and pile the same at the side thereof."

The third class of material to be removed from the right of way is described as follows, continuing to quote from paragraph 2 of the specifications:

"All stumps, roots, whether embedded in the ground or not, shall be grubbed and removed and cleared and cleaned from the right of way to the satisfaction of the Engineer in charge."

It clearly appears from the evidence that the Weyerhaeuser company permitted the stumps and roots to be placed upon their land. The only class of material that could not be deposited upon the Weyerhauser land was "all other organic material" which the subcontract provided "shall be removed and cleaned up from said right of way to the satisfaction of the engineer in charge." That material could have been

burned on the right of way—a part of it was so destroyed by the subcontractors. In completing the subcontract, McBride burned "all other organic material" on the right of way.

In *Brown v. Ehlinger,* 90 Wash. 585, 156 Pac. 544, the defendant agreed to excavate and remove rock from the plaintiff's lots. The plaintiff agreed that the defendant might use a rock-crushing plant then on the lots for the purpose of crushing and removing the rock from the lots. While engaged in the work, the defendant was enjoined at the suit of an adjoining property owner from operating the rock crusher which had been installed upon the property. We held that the crushing of the rock for removal from the lot was a mere detail of the contract; and that the defendant could not excuse a breach of the contract on the ground that he had been enjoined from operating the crusher on the premises. We said:

"It was no doubt the understanding of the parties that the rock was to be crushed on the premises, and it may be that the appellants would not have entered into the contract if they had not understood that they could crush the rock on the premises. And it may be —it no doubt was—the intention of the respondents to allow the crusher to be operated upon their lots pending the removal of the rock, but these are mere details of performance. They do not go either to the essence or the subject-matter of the contract. Courts cannot set aside contracts because the performance of them becomes more difficult or more expensive than when they were entered into. If it were so, few contracts would survive the seasons of depression that periodically recur in the business world. . . .

"In the case at bar, the manner of executing the contract, the several purposes of which have been hereinbefore stated, was, in no sense, the 'essential indispensable item.' The crushing of the rock into a manufactured product, in which, by the very terms of the contract, respondents had no interest or ownership

whatever, was a collateral item, a detail affecting the cost of the work which appellants had assumed to do.

"And, by the same reasoning, it must be held that appellants are not to be excused because the operation of the rock crusher was enjoined at the suit of some private litigant. Appellants assume that the contract provides that the rock shall be crushed on the premises, and that 'the law' has made performance impossible. The rule, as contended for, seems to be that a person will be excused from the performance of a contract where the performance becomes impossible through the act of God, '*the law*,' or by the acts of the other party to the contract. We might profitably inquire into the meaning of the words, 'the law' as they are employed in the text books and cases; the question being whether they refer to legal proceedings instituted by a private litigant, or whether the law refers to some statute which would make the execution of the contract an illegal thing, or possibly to an action begun by or on behalf of the public. It would seem like an extraordinary proposition to hold that one who had assumed to do a particular work, and who, in the performance of his contract, so conducted his operations as to make of them a nuisance, could, in turn, insist that a decree declaring his methods to be tortious to his neighbor was either the act or operation of the law; for it is a settled principle that every legal act may be done in a negligent manner or in such a manner as to be a nuisance to others. To apply the rule, we must hold that the place of crushing the rock is of the essence of the contract. We have demonstrated that it is not. Respondents had no interest in the crushed rock and, from the nature of things, could have no concern whether the rock was crushed on the premises or elsewhere. It is only those items or elements in a contract which are seasoned with mutuality that may be called of the essence of it."

The case at bar is not distinguishable in principle from the case cited. The methods of disposition of "all other organic matter" cleared from the right of way were mere details of performance. That pro-

628

vision of the subcontract did not go either to the essence or the subject matter of the contract. The fact that the contract was unprofitable because the subcontractors did not foresee the cost of removal of the organic matter affords no basis for the defense of impossibility of performance.

"It is well settled, as a general rule, that if performance is rendered merely difficult or burdensome or unprofitable, the promisor is not excused; and the same is true generally if the impossibility is personal to the promisor, and does not inhere in the nature of the act to be performed. On the latter point, it was said in *Oregon* case: 'It is no excuse for the nonperformance of a contract that it is impossible for the obligor to fulfil it, if the performance be in its nature possible . . . There is a marked distinction, not to be overlooked in this connection, between a mere disability or inability of a party to perform a contract and the absolute and inherent.impossibility of performance in the true sense. . . . Unless an act is inherently impossible within itself, a contract to do it is binding, although the performance may be improbable, or even impossible, to the promisor. To excuse performance, the impossibility must be simply more than merely a great inconvenience, hardship, or even impracticability.' And a similar rule has been laid down in other cases." Note, L. R. A. 1916F, 31.

The judgment in the action of the subcontractors against McBride and his surety is reversed, and the cause remanded with direction to dismiss. The judgment dismissing the action of McBride against the subcontractors and their surety is reversed, and the cause remanded with direction to make findings of fact and render judgment in favor of McBride in the amount to which he may be found entitled.

BEALS, C. J., MITCHELL, BLAKE, and HOLCOMB, JJ., concur.