[No. 37757.   Department One.   January 13, 1966.]

WILLIAM CANNON, JR., *Respondent,* v. ALBERT J. HUHNDORF *et al., Appellants.*\*

*Beresford & Booth* and *Robert Baronsky, for* appellants.
*John W. Sweet,* for respondent.

\*Reported in 409 P.2d 865.

HALE, J.—For the first time in his young life, William Cannon, Jr., at the age of 21 years, essayed the role of entrepreneur. With boundless confidence in his ability gained through not more than two years in construction work and some ideas and plans, he set out to develop a building project involving 14 duplex residences on a 14 lot tract. Without credit, broke, and in the throes of a divorce action, he had no corporeal assets to bring to the project. Financing was the big obstacle; he lacked money. He had, with the help of an architect, designed a duplex dwelling house called the 104-A as a master plan for the project for the land he had in mind had been zoned for duplexes and triplexes.

A friend in the real estate business took young Cannon to the office of System Finance, Inc., in the University district of Seattle and introduced him to the company's officers, hoping to interest them in financing the enterprise. Cannon showed the company president, a Mr. DeWitte, and its secretary-treasurer, defendant Albert J. Huhndorf, his building plans for the 14 duplex residences on the suggested lots. The company president and Mr. Huhndorf both expressed interest in providing the financing but said they would have to examine the property further and a second meeting was held in late November or early December, 1961. After that, at a price of $22,000 for the entire 14 lots, Cannon put down earnest money by delivering his personal note in the sum of $1,000.

Mr. Huhndorf, learning of the earnest money transaction, advanced $50 toward the earnest money by personal check and Cannon's note was accordingly reduced to $950. Huhndorf, acting for System Finance, and Cannon agreed to develop the 14 lots by putting in roads, water, sewers, and constructing the 14 duplex residences from the 104-A plans supplied by Cannon. Financing was to be arranged by System Finance, with Cannon in charge of construction.

About two months after the November or December meeting at System Finance's office, Huhndorf set Cannon up in one of their offices in the University district where the latter began preparing the detailed plans and specifications with which to complete the project. Meanwhile, in

February, 1962, Huhndorf, advancing $11,000 from his own funds, had put title to the 14 lots in escrow in Cannon's name.

Cannon's description of the negotiations, his partial performance and details of his agreement with System Finance and Huhndorf, coincided largely with that of defendants. The 14 duplexes would be built according to the 104-A plan drawn by Cannon; he would act as general contractor for construction of the buildings and another contractor would be engaged on a bid basis to take charge of the land development, streets, excavation and contour changes. Profits from the venture, after payment of all costs and expenses were to be divided evenly, 50 per cent to plaintiff Cannon, and 50 per cent to System Finance for arranging the financing.

The parties disagree on one crucial detail. Cannon testified that Huhndorf's promise that System Finance would provide complete financing was unconditional and categorical; Huhndorf said their undertaking to arrange financing was dependent upon several conditions. Huhndorf insists that their promise to finance the project depended on their acquiring clear title to the land, on their being able to convince lending agencies of Cannon's ability as a contractor, and, most importantly, on System Finance and Huhndorf being able to persuade others to lend the money. He says that Cannon fully understood, and it was a condition of their agreement that System Finance did not agree to advance its own funds but that financing the entire project depended on System Finance's ability to obtain the funds elsewhere.

System Finance advanced Cannon $1,002.50 for rental of office furniture and living expenses after he moved his equipment into their office space with the understanding this money would be charged against plaintiff's 50 per cent of the profits. There Cannon continued with drawings, plans and preparation to get into construction. Huhndorf set about methodically to obtain financing; he submitted the proposal to many banks, savings and loan associations and other lending institutions and was turned down by each. Even

his own bank, where his credit was good, declined not only to advance the money but cautioned him to stay out of the deal. Finally, confronted with the certainty that money could not be raised, Huhndorf precipitated the scheme's denouement by obtaining Cannon's signature to the escrowed instruments and, thereby acquiring title to the 14 lots, closed down the office space used by Cannon. He told Cannon that the contract was at an end, and offered to sell the lots to the latter for the amount of his (Huhndorf's) investment in them. On Cannon's failure to buy them, Huhndorf sold the 14 lots to a corporation which erected 11 triplexes thereon.

Cannon brought this action for breach of contract to recover his lost profits. From a judgment entered on a jury verdict of $11,447.50, defendants Albert Huhndorf and System Finance, Inc., appeal.

Defendants first assign error to the court's refusal to grant judgment notwithstanding the verdict, urging that the plaintiff failed to prove a condition precedent to their duty to perform, i.e., that financing was in fact available to defendants from sources other than defendants' own resources. But our study of the record shows abundant evidence both to support the trial court's findings of an unconditional undertaking to supply the financing, and plaintiff's commencing to perform his part of the contract. Contrarily, there was ample evidence to support defendants' position that the agreement to finance the project was dependent on money being obtainable from existing financial institutions. The evidence, therefore, would support a verdict for either party.

The record shows that the court submitted these issues of fact to the jury in its instructions and, no exception being taken thereto, the instructions became the law of the case. *Sevener v. Northwest Tractor & Equip. Corp.*, 41 Wn.2d 1, 247 P.2d 237 (1952). Issues of fact thus raised by appellants having been resolved against them by the jury in a verdict supported by substantial evidence, the court properly denied judgment non obstante veredicto.

The other assignment of error concerns a claim of supervening impossibility. Defendants showed that, in the hopes of providing financing for the project, they had submitted their proposal and made application to every conceivable financial and lending institution and agency that could possibly be expected to show an interest in lending money; that all of their efforts were in vain; that no lending institution or agent could be found or was one available that could possibly be persuaded to finance the project; and that, therefore, the contract became one legally recognized as impossible of performance.

They refer to *Guglielmelli v. Walla Walla Gardeners' Ass'n*, 157 Wash. 109, 288 Pac. 251, 77 A.L.R. 385 (1930), to support their contention of impossibility, but we cannot see where that case turns on the application of or involves the doctrine. We held there that, where a cooperative marketing association refused a member's produce because it found it impossible to market the produce at a profit, denying the member permission to sell the produce himself amounted to a breach of contract entitling him to a return of his $300 membership fee. We read nothing more into that decision.

■ Nor does the doctrine of impossibility, excusing as it does the performance of a contract by one or more of the parties, otherwise seem to enter the picture in the instant case. Impossibility of performance is not the legal equivalent of inability to perform. Accepting the definition of impossibility set forth in the Restatement, Contracts § 454 (1932), as meaning "not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved," the doctrine of impossibility is not available to the defendants as a defense here for the jury had evidence that defendants' promise to provide financing was unconditional and dependent only upon plaintiff's promises of performance.

That defendants found themselves unable to perform does not mean that financing the project should be regarded as impossible of performance.

Impossibility of performing a promise that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract. Restatement, Contracts § 455 (1932).

Judgment affirmed.

ROSELLINI, C. J., HILL and OTT, JJ., and LANGENBACH, J. Pro Tem., concur.