[No. 2560–2.   Division Two.   May 8, 1978.]

ERNEST E. LINER, ET AL, *Appellants,* v. ARMSTRONG
HOMES OF BREMERTON, INC., *Respondent.*

*Walter M. Hackett, Jr.,* and *Arthur, Hackett & Cyr,* for
appellants.

*Lewis S. Armstrong,* for respondent.

Soule, J.—This is an appeal from a judgment and an award of damages in favor of Armstrong Homes on its counterclaim.

On October 30, 1974, the parties involved entered into a written contract for the construction of a prefabricated home on property recently purchased by plaintiffs in Kitsap County. The purchase price of the home was $31,305.30. This total included both a salesman's commission of $1,179.04 and a 25 percent profit factor. The contract contained several provisions which imposed various obligations on the parties. Armstrong Homes, as the contractor, was required "To give all requisite notices to the proper authorities; obtain all official inspections, permits, certificates and licenses made necessary by the work in his charge."

The contract also stipulated "Power and water are to be provided by the owner prior to starting date."

Additionally, the contract was conditioned on the approval of the site by local health authorities, the building authorities and the owner's procurement of a loan, if necessary.

Prior to the October 30 agreement, the plaintiffs had contacted Sun Industries, Inc., a public water–source supplier which serviced an existing neighboring development known as Green Mountain. Plaintiffs learned that for an initial hook–up charge of $200 and $4 per month thereafter, their water needs would be satisfied.

On December 3, 1974, plaintiffs submitted a building site application to the county health officials. This application was a prerequisite in Kitsap County to obtaining a building permit. Its approval hinged on existence of an available and adequate water supply whose private or public nature must also be revealed. The plaintiffs' application was denied because their contemplated public water supply, Sun Industries, was not a state–approved water supply service. Plaintiffs immediately confronted Sun Industries with this disconcerting information and were assured that it planned

to update its system in April 1975 to meet state requirements.

On January 3, 1975, the plaintiffs reapplied, and on this occasion represented on the basis of information received from the prior owner that there was an independent private water supply on their property in the form of an existing well. At plaintiffs' direction, a drain field diagram was marked with an "X" designating the well's alleged location. Plaintiffs informed the health department officials that they thought the well was too shallow and its quality too low (impure) to be used permanently, but that its temporary use until Sun Industries attained state clearance, was practical and feasible. Based on these representations, the application was issued with the notation that the private supply, the well, would be utilized as temporary water until Sun Industries was approved.

On January 14, 1975, Metropolitan Federal Savings & Loan Association, the finance company which, through arrangements made by defendant, had earlier agreed to furnish plaintiffs a loan, questioned the adequacy of the property's water supply. It requested some assurance that there was a supply agreement between plaintiffs and Sun Industries. On January 15, 1975, plaintiffs furnished via one of defendant's salesmen, a statement from Sun Industries reflecting that it had been willing to supply water to one of the prior property owners and there was other evidence that such willingness was continuing.

On January 15, 1975, the building plans were finalized by the parties and plaintiffs made a $5,065 payment. On January 22, 1975, Metropolitan informed defendant that it could commence construction. Defendant then applied for a building permit. The submission of the previously approved building site application enabled and ensured the permit's issuance on January 28, 1975. This same day, defendant called the factory in Auburn, Washington, and ordered the framing of the house. On January 30, 1975, defendant was advised by Metropolitan that a water supply problem still persisted and that until the Sun Industries' supply was

state–approved or plaintiffs proved the existence of their well and that it would meet purity standards, no funds would be forthcoming. Defendant immediately contacted the factory and halted the construction. Defendant's evidence was that by this time, $6,276.22 in construction costs had been incurred along with $1,179.04 in salesman's commission.

After plaintiffs were told of this development by the defendant, they made no attempt to locate the alleged well and further refused to provide one and sought return of their $5,065 payment.

The special custom design of plaintiffs' home prevented defendant's complete recoupment of its expenditures on materials. After diligent efforts, defendant was able to resell only a portion of the cut materials at a price of $2,576.63. The remainder had no value.

The trial court found plaintiffs had breached the contract. Damages were fixed by cumulating the sales commission, the construction costs incurred to date of cessation and adding a 25 percent profit to the construction costs.

The gross total found by the court was $9,024.72. We will review the computations of credits to be allowed at a later point.

Plaintiffs' main contention on appeal is that the unavailability of Sun Industries as a water source excused their performance under the contractual doctrine of impossibility of performance. We find that impossibility was not established and also find that an independent ground justifies imposition of liability on plaintiffs.

In Washington, a false representation as to a material fact is actionable although made through an honest mistake. Such representations constitute constructive fraud despite the presence of good faith. *Thompson v. Huston,* 17 Wn.2d 457, 135 P.2d 834 (1943); *Stanley v. Parsons,* 156 Wash. 217, 286 P. 654 (1930); *McDaniel v. Crabtree,* 143 Wash. 168, 254 P. 1091 (1927); *Pratt v. Thompson,* 133 Wash. 218, 233 P. 637 (1925). It is evident that plaintiffs' representations regarding the presence of a well on their

property were made carelessly without knowledge as to their truth or falsity. These representations were the catalyst which triggered the approval of the building site application. This application in turn was explicitly relied upon by defendant in obtaining the building permit. The issuance of the building permit and defendant's subsequent commencement of construction are inextricably interwoven and are a product of plaintiffs' representations. Absent these representations, the building site application would have been denied, no building permit would have been issued and no construction would have begun.

Plaintiffs unquestionably knew of defendant's intent to use the application to acquire a building permit and to begin construction soon thereafter. In their anxious and expectant "new home" mood, plaintiffs desired such action. The evidence is clear that plaintiffs made material misrepresentations of fact which were relied upon by defendant to its detriment.

Nor can defendant's right to recover be defeated by plaintiffs interposing the doctrine of impossibility of performance because there would have been no *required* performance in the absence of these representations. *Cf. Marr v. Cook*, 51 Wn.2d 338, 340, 341, 318 P.2d 613 (1957).

Plaintiffs' position is not improved merely because defendant knew before January 28 that Metropolitan harbored doubts about plaintiffs' water supply. Defendant's awareness did not place it in a position where it assumed the risk that the funds would be withdrawn and construction halted. When Metropolitan initially raised the water problem in the middle of January, plaintiffs supplied the defendant with the letter of agreement between Sun Industries and a prior owner of plaintiffs' property. Defendant then transmitted it to Metropolitan. Even though this letter of prior commitment did not conform precisely with the request of Metropolitan, defendant had good reason to believe it was sufficient when on January 22 the former contacted defendant's local manager and gave him clearance for commencement of construction. Metropolitan

made no mention on any of these occasions of any lingering reservations regarding Sun Industries' "nonapproved" status. Indeed, no indication was given until it stopped the loan. Under these circumstances, it cannot be said defendant was in any way at fault.

██ Even if we chose not to adhere to this view, we would be unable to hold that because performance became more difficult for defendant that this fell within the bounds of contractual impossibility. Impossibility of performance, which excuses a party's performance of a contract, is not the legal equivalent of subjective inability to perform. The doctrine does encompass both strict impossibility and impracticality due to extreme and unreasonable difficulty, expense, injury or loss. *Oneal v. Colton Consol. School Dist. 306,* 16 Wn. App. 488, 557 P.2d 11 (1976); *Scott Paper Co. v. Burlington Northern, Inc.,* 13 Wn. App. 341, 534 P.2d 1031 (1975); Restatement of Contracts § 454 (1932). *See also Cannon v. Huhndorf,* 67 Wn.2d 778, 409 P.2d 865 (1966). The mere fact that a contract's performance becomes more difficult or expensive than originally anticipated, does not justify setting it aside. *Westland Constr. Co., Inc. v. Chris Berg, Inc.,* 35 Wn.2d 824, 215 P.2d 683 (1950); *J.D. Harms, Inc. v. Meade,* 186 Wash. 287, 57 P.2d 1052 (1936); *McBride v. Callahan,* 173 Wash. 609, 24 P.2d 105 (1933); *White v. Mitchell,* 123 Wash. 630, 213 P. 10 (1923); Restatement of Contracts § 467 (1932).

It has long been recognized in Washington that when a party by his contract assumes an unqualified duty, he is bound to perform if possible, notwithstanding the occurrence of an unexpected, yet foreseeable event, against which he might have guarded in his contract. *J.D. Harms, Inc. v. Meade, supra; McBride v. Callahan, supra; White v. Mitchell, supra; Brown v. Ehlinger,* 90 Wash. 585, 156 P. 544 (1916). Here, plaintiffs promised unconditionally to provide the water supply for their home. They did not condition their performance on the availability of Sun Industries' water. Although they contemplated using this source, they made no provision for the contingency that it might be

unavailable. The utilization of Sun Industries as the source of their water supply was a matter of contractual detail. *J.D. Harms, Inc. v. Meade, supra.* Had it been intended as the sole source, this fact could have been expressed in the contract. By failing to condition their obligation to provide water, plaintiffs assumed the risk that Sun Industries would not be available.

We recognize that the necessity of locating the alleged well or digging a new one in order to fulfill their assumed responsibility would make the plaintiffs' performance more expensive and difficult. However, it was not shown that this performance was either impossible or economically impractical.

Being unable to *visually* locate the alleged well, the plaintiffs made no other efforts. Metropolitan's pledge to renew the loan if plaintiffs confirmed the presence of the well, went unheeded. Neither did they attempt to drill a well despite the fact that, though its cost would have been substantial, it was estimated to be less than the loss to which they are exposed by this litigation.

Plaintiffs simply thought either course was unreasonable when a potentially cheaper source was present at Sun Industries. This position makes it evident that their non-performance was based purely on a refusal to seek a source other than Sun Industries. Although Sun Industries was originally the intended supply, we believe plaintiffs' representations regarding the purported well eliminated their singular reliance on this source and demonstrated their contemplation of a possible alternative, at least temporarily. This alternative was successfully urged to health department officials. The impact of plaintiffs' representations combined with their commitment to temporarily supply water from this alternative source, mandated more diligent efforts in locating it.

In light of the peculiar facts of this case, particularly the plaintiffs' failure to make any attempt to locate the alleged well, plaintiffs' defense of impossibility of performance remains unsubstantiated and without foundation. The

frustration of purpose of which plaintiffs complain was self–induced.

Finally, plaintiffs contend that the trial court in fixing the amount of damages erred by including lost profits in the total. The measure of damages for an owner's wrongful termination of a building contract partly performed is the good faith expenditures in part performance plus the amount of profits which might reasonably be anticipated and which the evidence makes reasonably certain. *Di Luck v. Bradner Co.,* 111 Wash. 291, 190 P. 904 (1920); *General Lithographing & Printing Co. v. Washington Rubber Co.,* 55 Wash. 461, 104 P. 650 (1909); Restatement of Contracts §§ 331, 346, Comment 2(h) (1932); *cf. West v. Jarvi,* 44 Wn.2d 241, 266 P.2d 1040 (1954). The contract in question had a built–in 25 percent profit ratio which was known to the parties. After plaintiffs' breach, defendant sought this percentage only on its costs incurred to date and not over the entire contract.

We find that there is substantial evidence to support finding No. 7 of the trial court, that defendant was entitled to $9,024.72 for expenditures, including 25 percent profit on the actual expenditures to which the trial court properly added the sales commission paid, subject to credit for the down payment and for the salvage realized from some of the material originally committed to plaintiffs' project.

Defendant's cost breakdown (exhibit 12) might support a figure of $9,475.96 but this was not adopted by the trial court.

By using the figure of $9,024.72 and subtracting $5,065, the sum paid by the plaintiffs, a difference of $3,959.72 is obtained. We are unable to determine the derivation of the $4,410.17 in finding No. 10 because the complete computation is not set forth. It approximates the result obtained by subtracting $5,065 from $9,475.96, the amount set forth in defendant's brief as the total sum expended. That difference of $4,410.96 still demonstrates a discrepancy of 79 cents. We therefore take the liberty of recomputing the damages.

From the sum of $3,959.72 we subtract the salvage realized of $2,576.63. The difference is $1,383.09 which we deem to be the damages properly allowable to the defendant.

The judgment in favor of the defendant cross–claimant should be modified accordingly to fix the damages in the sum of $1,383.09. In all other respects, the judgment of the trial court is affirmed.

REED, A.C.J., and PETRIE, J., concur.