**CONTINENTAL SHIPPERS' ASSOCIATION, Inc., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18672.**

United States Court of Appeals Ninth Circuit.

Feb. 25, 1964.

Rehearing Denied March 27, 1964.

 

Knapp, Gill, Hibbert & Stevens, and Wixon Stevens, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Section; and David R. Nissen, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, ORR and BARNES, Circuit Judges.

ORR, Circuit Judge.

Continental Shippers' Association, Inc., is a non-profit organization which ships freight for its members in order to generate enough volume to obtain carload rates and provide other services. It shipped a large volume via Southern Pacific Railroad from Chicago to Los Angeles. In connection with this activity, Southern Pacific had granted Continental credit privileges as authorized by the Interstate Commerce Act, 49 U. S.C. § 3(2) (1959), and the regulations thereunder, 49 C.F.R. §§ 142.1–.15 (1958) and 142.1b (Supp.1963).

Those regulations provide that, where credit is extended to a shipper by a railroad, the charges shall be paid within 120 hours computed as specified therein. Continental had failed to make timely payment of its freight bills on occasions in the past. In December of 1961 it again began to exceed the 120 hour permissible credit period because of its poor financial condition. Its delinquencies continued into January and February of 1962. Finally, on February 6, 1962, Southern Pacific suspended Continental's credit privileges because of its failure to pay. Since that date Continental has been on a cash basis with Southern Pacific.

This case is a criminal prosecution brought on thirty counts, each charging a violation of the Elkins Act, 49 U.S.C. § 41(1) (1959). Each count alleged one of Continental's delinquencies in December of 1961 or January or February of 1962 as an offense. Trial was had and conviction obtained on all thirty counts.

The Elkins Act provides, in part, that:

"it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate * * * commerce by any common carrier subject to [the Interstate Commerce Act] * * * whereby any * * * advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor * * *."

That the transportation here was in interstate commerce by a common carrier subject to the Interstate Commerce Act was stipulated. In order for the conviction to be upheld, then, the record must disclose that Continental (1) knowingly, (2) solicited, accepted, or received (3) a rebate, concession, or discrimination (4) whereby any advantage was given or discrimination was practiced.

The government's theory, in brief, was that Continental's failure to make timely payment of its freight charges resulted in a concession or discrimination in the nature of an extension of credit, giving Continental a longer time to pay its bills than other shippers received. The result, argues the government, was the receipt of an advantage or discrimination by allowing Continental to operate on Southern Pacific's capital, without interest.

■ Continental challenges its conviction on many grounds. Since we conclude that the evidence, even when viewed most favorably to the government,[1] does not show a violation of the Elkins Act, we do not discuss all of its objections.

I

*The Meaning of "Concession or Discrimination"*

■ The Elkins Act's prohibition of "concession or discrimination" "implies a comparison with, a measurement by, and a departure from, a determined standard."[2] The comparison is to be made with the treatment normally accorded other shippers by the railroad. A mere violation of the Interstate Commerce Act credit regulations does not necessarily violate the Elkins Act. But the credit regulations are related to the alleged violations of the Elkins Act in that they give rise to an opportunity to discriminate by establishing a standard from which deviation can occur. Because of the credit regulations, the railroad insists on, and usually obtains, payment of bills within 120 hours. It is only in this regard that the regulations are relevant.

■ The words "concession or discrimination" also require that a two-party transaction exist before the Elkins Act is violated. It is not enough that a shipper know that he is in a different position than other shippers; the railroad must have put him in, or he must have asked the railroad to put him in, that position. If the word "advantage" had been used by Congress to describe the prohibited acts, the opposite might be true. An "advantage" can be obtained with or without the aid of another. But the Act forbids only those advantages gained by means of a "concession or discrimination". The word "advantage" was used only to describe the result, and not the prohibited acts themselves. The prohibited acts, concession or discrimination, require that a conceding or discriminating party exist.

■ This is not to say that there must be knowing co-operation between shipper and carrier before the Elkins Act can be violated. United States v. P. Koenig Coal

---

1. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Bolen v. United States, 303 F.2d 870 (9th Cir. 1962).

2. Standard Oil Co. of Ind. v. United States, 164 F. 376, 390 (7th Cir. 1908) (concurring opinion), cert. denied 212 U.S. 579, 29 S.Ct. 689, 53 L.Ed. 659 (1909).

Co., 270 U.S. 512, 46 S.Ct. 392, 70 L.Ed. 709 (1926), established the proposition that guilty knowledge or collusion on the part of both parties is not required. But Koenig Coal did not ignore the two-party nature of concession or discrimination. In that case the defendant had made a misrepresentation to a railroad which resulted in defendant's receiving an allocation of railroad cars which was not permissible under an emergency transportation order. The Court, in reversing the district court's dismissal of indictment, faced the question of who the conceding party was and stated that it was the railroad which made the concession and gave the advantage. Since the railroad had acted innocently, though, it did not violate the Elkins Act. But in Koenig Coal it was recognized that a conceding or discriminating party, albeit unknowing, is needed before a concession or discrimination can occur.

The government contends that "receipt" of discriminatory credit extensions occurred when Continental shipped and did not pay the charges within the period in which others were required to pay; and that various acts of Continental constituted solicitation of credit extensions. These will be discussed separately.

## II

### Failure to Pay Bills as Receipt of a "Concession or Discrimination"

 The mere fact that Continental failed to pay its freight bills within 120 hours and thus took advantages which it knew other shippers did not receive does not show acceptance or receipt of a concession or discrimination. As heretofore stated, no concession or discrimination could be accepted or received unless one was given by the railroad. It was not shown here that the railroad acted discriminatorily. The evidence merely indicates that the railroad allowed Continental to ship freight, as it did any other person desiring to do so, and extended to Continental the allowable credit. This was no concession or discrimination but only the giving of what lawfully could

be and was given to any shipper. Any advantage gained by Continental was gained entirely by its own action through its failure to pay freight bills after the freight had been received. Though an "advantage" may have existed, it was not obtained through a discrimination or concession either knowingly or innocently granted by the railroad, and thus did not violate the Elkins Act.

 Of course, if the evidence had shown a long-standing record of unobjected-to late payments, a course of action amounting to the giving and receiving of discriminatory credit might be found. But the railroad continually objected to Continental's late payments and went so far as to suspend Continental's credit privileges on October 25, 1960, for delinquencies occurring prior to that date. Continental's credit was later reinstated and between that time and the events involved in this case there was no regular pattern of late payments. On those occasions when Continental did exceed the 120 hour limit Southern Pacific urged prompt payment. Thus, there is no support for the theory that Southern Pacific, by its course of action, gave Continental a concession or discrimination.

## III

### Solicitation of a "Concession or Discrimination"

 The government points to several acts which it argues amount to solicitation. These occurred both before and after the shipments involved had taken place. Since an alleged concession or discrimination before shipment is tested by a different standard than one after shipment, the acts will be discussed in those categories.

### A. Acts of Solicitation Before Shipment

Before shipment, the standard from which credit concessions or discriminations must be measured is the time within which the railroad normally requires its shippers to pay. The railroad's policy here was to require payment within the time specified in the regulations and al·

most all of its shippers complied with this policy. Thus a request for more than 120 hours in which to pay for a given shipment would be solicitation of a concession or discrimination with respect to that shipment.

The transactions pointed to as "solicitations" of credit before shipment did not in fact request such a longer credit for the shipments charged in the information. They are either too remote in time to relate to the shipments in question, or are "solicitations" of completely legal advantages. For instance, the government cites the fact that Continental agreed to obey the time of payment regulations in its application for credit made June 15, 1960. But by the application only the lawful credit of 120 hours which was afforded any shipper was asked for; Continental could not have expected Southern Pacific to give them anything else by their form application.

The government points also to Continental's threats that its traffic would be routed over other lines if Southern Pacific gave any further trouble on the matter of timely payment. One of these threats was made on October 24, 1960, and was in reference to Continental's difficulties which culminated in suspension of its credit on October 25, 1960; that threat does not support a charge of solicitation of credit over a year later on entirely different shipments. The "several" other threats which were testified to by a government witness were not given a date. Hence it is not shown that they bear any closer connection to the shipments involved here, and they cannot support the charge of solicitation for these shipments.

Neither do we feel that solicitation is shown by the testimony of Continental's managing director to the effect that he knew when goods were shipped that the bills might not be paid on time. His knowledge was not communicated to Southern Pacific, and the act of shipping

itself did not request Southern Pacific to do anything more than transport the goods.

### B. Acts of Solicitation After Shipment

After shipment is completed and payment has not been made within 120 hours, what the shipper solicits must still be compared with the normal treatment of others to determine if a concession or discrimination is asked for. The others in this case are those who also have exceeded the credit period.

The government points to the following instances of solicitation after shipment had been made:[3] On February 5, 1962, Continental advised Southern Pacific that it was airmailing a check to cover delinquent bills, but the check was never mailed; Continental's president informed a Southern Pacific agent on February 6, 1962, that Continental was undergoing a reorganization and because of this would have to be a little late in payment of its bills, and asked the railroad to be "understanding" in connection with the problem; late in February, 1962, Continental's managing director requested more time in which to pay its bills; Southern Pacific agreed not to bring suit for a period of time in which Continental would attempt to pay up its bills; and in June, 1962, Continental suggested an installment type payment plan by which it might clear up its debts.

Since some of these statements ask for more than the usual 120 hours of credit, they might well constitute solicitation of a concession or discrimination if they had been made before shipment. But they were all made after the last shipment took place on February 3, 1962. The Elkins Act does not make the mere failure to pay bills in violation of the regulations a crime, without more. Neither does it make criminal a dialogue between creditor and debtor aimed at resolving an existing default and securing

---

3. The first of the shipments charged in the information was made on December 2, 1961, and the last on February 3, 1962. Southern Pacific suspended Continental's credit for failure to pay on February 6, 1962. As of the time of trial, twenty-four out of the thirty shipments charged as violations had not yet been paid for.

the payment of delinquent bills, without more.

We conclude that the evidence established only this: because of its pressing financial problems, Continental failed to pay its obligations on time. Continental then informed the railroad of its problems, and suggested steps to resolve the debt. The railroad, after consideration, disclosed to Continental the steps which it intended to take to collect the debt. But it was not shown that the railroad would not discuss or make reasonable efforts to settle like problems of other shippers in similar circumstances. Therefore, no discrimination or concession was shown.

A consideration of the record as a whole convinces us that Continental did not solicit, accept, or receive a concession or discrimination; hence there was a failure of evidence to support the charge.

Reversed.