TAYLOR–EDWARDS WAREHOUSE & TRANSFER CO., OF SPOKANE, INC., a Washington corporation, Plaintiffs-Appellants,

v.

BURLINGTON NORTHERN, INC., a foreign corporation, Defendant-Appellee.

No. 82–3428.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1983.

Decided Sept. 12, 1983.

---

William H. Robertson, Seattle, Wash., for plaintiffs-appellants.

Lawrence D. Silvernale, Seattle, Wash., for defendant-appellee.

Before ANDERSON and FLETCHER, Circuit Judges, and JAMESON,* District Judge.

·FLETCHER, Circuit Judge:

This case concerns the interpretation to be given a provision in a lease that obligates Burlington Northern, the lessor, to "maintain, operate, and make available for use" by Taylor-Edwards, the lessee, a section of spur track adjoining the warehouse leased by Taylor-Edwards from Burlington Northern. The district court ruled that the lease does not require Burlington Northern to maintain access by rail from a main line to the warehouse, since maintaining access would require the railroad to reconstruct a bridge that has fallen into disrepair. We conclude that the lease requires Burlington Northern to provide rail access to the warehouse spur, and that Burlington Northern has presented no valid defense to the obligation. Accordingly, we reverse.

## I

## FACTS

On February 29, 1956, Taylor-Edwards Warehouse & Transfer Co. of Spokane (Taylor-Edwards) agreed to lease a building owned by Great Northern Railway, Burlington Northern's predecessor,[1] for use as a warehouse. The lease covered a period of 20 years, and Taylor-Edwards was given an option to extend the lease for another 20 years. Drafted by the railroad, the lease agreement imposed numerous obligations and restrictions on Taylor-Edwards as lessee. The monthly rental was fixed at $200.

The leased warehouse, formerly used by railroad companies as a car barn and as a machine shop, was situated next to a major Great Northern rail line. The warehouse was served by a siding connected to the line by a spur track. One paragraph of the lease dealt with the siding:

Lessor hereby grants Lessee license and permission to use in common with Lessor and such other parties as Lessor may permit the [siding area] for access to said demised premises, and for loading and unloading thereon; and Lessor does further grant Lessee license and permission to use in common with Lessor and such other parties as Lessor may permit such of Lessor's lands as Lessor may from time to time select, not exceeding a width of 25 feet, as an access road to said demised premises from Trent Avenue in the City of Spokane ... and Lessor agrees to maintain, operate and make available for use by Lessee the trackage [of the siding].

Taylor-Edwards paid its rent in timely fashion and complied with all of its other lease obligations. In 1976, Taylor-Edwards exercised its option and extended the lease through 1996.

Since 1956, the nature of rail traffic in the Spokane area has changed dramatically. When the lease was created, the main Great Northern line crossed the Spokane River just east and west of the warehouse via railroad bridges. In 1971, Great Northern Railway merged with Burlington Northern, and as a result, the Great Northern mainline running past the warehouse was no longer needed for through traffic. Burlington Northern removed the bridge and track to the east of the warehouse, but continued to provide rail access to the warehouse and other nearby industries via the bridge to the west, Bridge C–1.3. The other industries served by the rail spur subsequently ceased their rail operations. By 1981, Taylor-Edwards was the sole remaining customer served by the rail line extending across Bridge C–1.3.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Burlington Northern acquired Great Northern Railway's interest as a result of a merger in 1971. Paragraph 12(j) of the warehouse lease provides that the contract is binding on all successors and assigns of Great Northern Railway.

Bridge C–1.3 was built in the early part of this century and was reconstructed in 1946. Since then, its condition has steadily deteriorated. By the late 1970's, the wooden pilings supporting the bridge were seriously weakened, and in 1981, the bridge was declared unfit for rail traffic. The cost of restoring the bridge to service was estimated at $275,000. Burlington Northern officials decided this expense was unwarranted in light of the fact that Taylor-Edwards was the only remaining customer served by the spur track across the bridge from the present main line. Burlington Northern first offered to remove the lease restrictions on use of the warehouse building in exchange for release by Taylor-Edwards of any obligation to maintain rail service. After Taylor-Edwards declined this offer, Burlington Northern elected to abandon the bridge. On July 17, 1981, Burlington Northern advised Taylor-Edwards that Bridge C–1.3 would be permanently removed from service, and that rail access to the warehouse siding would be discontinued.

Taylor-Edwards commenced this diversity action in district court, seeking damages for breach of the lease agreement. The parties filed cross-motions for summary judgment. The district court granted Burlington Northern's motion for summary judgment and denied Taylor-Edwards's motion.[2]

## II

## DISCUSSION

A. *Burlington Northern's Obligation Under the Lease Agreement.*

 The critical contract language to be interpreted in this case is the clause that states that "Lessor agrees to maintain, operate and make available for use by Lessee the trackage" in the siding area next to the warehouse. The district court, without relying on extrinsic evidence, ruled that this language does not require Burlington Northern to maintain rail access to the siding. This ruling is a freely reviewable conclusion of law.[3] *Culinary & Service Employees Union, Local 555 v. Hawaii Employee Benefit Administration, Inc.,* 688 F.2d 1228, 1230 (9th Cir.1982). Even if the proper interpretation of the meaning of the words of the contract depends upon the surrounding circumstances, the interpretation of the words in light of those circumstances is a question of law that we must resolve on a *de novo* basis. *See Martin v. United States,* 649 F.2d 701, 703 (9th Cir. 1981).

We have not discovered any reported case dealing with a lease provision similar to the one involved here. Taylor-Edwards cites *United States Fire Insurance Co. v. Northern Pacific Railway Co.,* 30 Wash.2d 722, 732, 193 P.2d 868, 874 (1948), to support its position that the term requiring Burlington Northern to "operate" the warehouse siding requires the railroad to maintain access to the main line. Burlington Northern relies upon *Fuller Market Basket, Inc. v. Gillingham & Jones, Inc.,* 14 Wash.App. 128, 133, 539 P.2d 868, 871 (1975), to show that a lease covenant such as the one at issue cannot be construed to affect the activities of a landlord away from the leased premises. Examination of these cases, however, reveals that neither is helpful.[4] We must turn to general principles of contract interpretation to determine the proper construction of the warehouse lease.

**2.** The district court made no written statement of its reasons for these rulings.

**3.** Normally, we accord deference to the conclusion of a district judge concerning the law of the state where the judge normally sits. *Insurance Co. of North Am. v. Howard,* 679 F.2d 147, 150 (9th Cir.1982). We do not accord deference in this case, however, because the sole issue decided by the district court concerned the interpretation to be given contract language. *Yamaguchi v. State Farm Mut. Auto. Ins. Co.,* 706 F.2d 940, 953 (9th Cir.1983).

**4.** In *United States Fire Ins. Co.,* the court stated that "the 'operation' of a railroad ... requires everything necessary to permit the trains and engines to move, such as the repair and maintenance of bridges, tracks, and buildings." 30 Wash.2d at 732, 193 P.2d at 874. While this statement is superficially relevant, the context shows the case to be distinguishable. The

■ Under Washington law, the role of the court in a contract action "is to ascertain the parties' intentions and give effect to their intentions." *Jones v. Hollingsworth,* 88 Wash.2d 322, 326, 560 P.2d 348, 350–51 (1977). This court in interpreting contracts has also focused upon the intentions and expectations of the parties at the time of contracting. *See, e.g., Union Pacific Railroad Co. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 549 F.2d 114, 116–17 (9th Cir.1976). The controlling intent of the parties must be ascertained from reading the contract as a whole, and where the language used is unambiguous, no ambiguity will be read into the contract. *Black Mountain Ranch v. Black Mountain Development Co.,* 29 Wash.App. 212, 215, 627 P.2d 1006, 1009 (1981). If the contract language is ambiguous, it must be strictly construed against the railroad, as the drafter of the governing instrument. *United States v. N.A. Degerstrom, Inc.,* 408 F.2d 1130, 1134 (9th Cir.1969); *Jacoby v. Grays Harbor Chair & Manufacturing Co.,* 77 Wash.2d 911, 918, 468 P.2d 666, 671 (1970).

■ We have been presented with two contrasting hypotheses as to the meaning of the lease statement that the railroad would "maintain, operate, and make available for use by Lessee" the siding next to the warehouse. One, urged by Taylor-Edwards, is that the railroad lessor must maintain usable rail access to the siding. The other, advanced by Burlington Northern, is that the lease requires no more than that the railroad maintain in functional condition the track actually located on the warehouse premises, regardless of whether that track is connected to other tracks so that it can be served by trains. We conclude that the language of the contract better supports the first construction. The railroad covenanted to make the siding "available for use by Lessee" and to "operate" the siding track, not merely to "maintain" the track. A rail siding is hardly "available for use," nor can it be "operated," unless connected to a main line so that trains can pass on to and off of the siding.

Other relevant considerations bolster this interpretation of the parties' intentions. The premises were leased by Taylor-Edwards in order to carry on its warehousing business, a use for which rail access to a main line was essential. Not only did both parties know that Taylor-Edwards was entering the lease for the purpose of operating a warehouse, the lease itself expressly *restricted* the permissible use of the building by Taylor-Edwards to warehousing. The circumstances surrounding formation of the contract thus demonstrate that the parties envisioned that the warehouse would remain linked to a rail network, and not just that Taylor-Edwards would remain

question there was whether a lease excluding recovery by the lessee for any loss arising from the "operation" of the railroad allowed recovery for fire damage caused by the negligent use of a weed burner in clearing a railroad right-of-way. The court held that such weed burning constituted a form of "operation" of the railroad. *Id. The decision sheds no light on the question whether a lease requiring the lessor to "operate" a rail siding requires the lessor to maintain usable access by rail from a main line to the siding.*

*Fuller Market Basket* involved the lease of a store in a shopping center that provided that Lessor will construct [an] additional building between the building herein leased and the main shopping center during the year 1963 or 1964 and when completed it, together with the property herein leased and the main shopping center, will constitute one continu-

ous set of buildings with a common mall area.
14 Wash.App. at 129–30, 539 P.2d at 870. The shopping center was completed as specified, but seven years later, due to flooding, the lessor ceased operations in the connecting buildings. The lessee sued, contending that the cessation of operations constituted a breach of the lease covenant. The court ruled that the quoted term created only an obligation to build the connecting building, and did not impose any duty upon the lessor to maintain its own retail operation in that segment. *Id.* at 133, 539 P.2d at 871. The express language was thus significantly different from that involved in the present case, where the covenant required the lessor to "maintain, operate and make available for use by Lessee" the siding for the duration of the lease.

assured of the existence on its property of a useless patch of track, maintained in good condition. Construing the contract to require access to a rail system better effectuates the purposes of the lease, and consequently better reflects the likely intent of the contracting parties. *See Union Pacific Railroad Co. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 549 F.2d 114, 117 (9th Cir.1976); *J.D. Harms, Inc. v. Meade,* 186 Wash. 287, 296, 57 P.2d 1052, 1056 (1936).

Further, the lease itself specifically contemplated that Taylor-Edwards would use the main line of the lessor's railroad to operate its warehouse. Paragraph 9 of the contract stated that

> The Lessee shall not permit any railroad company or any company or person engaged in any type of transportation other than Lessor, to use any track which is now or may hereafter be constructed upon the demised premises without express permission from Lessor in writing.

Paragraph 10 [5] stated in part that

> [t]he Lessee shall deliver or cause to be delivered to the Lessor for transportation over its line of railroad and connections all shipments which the Lessee can control made by or to the Lessee from or to the said premises.

These provisions show that the relationship between the warehouse and the Great Northern rail network was an integral part of the bargain between Taylor-Edwards and the railroad. The "maintain, operate and make available for use" language of the contract drafted by the railroad is most sensibly construed to mean a promise by the railroad to maintain effective rail access to the warehouse from a main line.

Burlington Northern argues that whatever the effect of the lease provision, it does not require Burlington Northern to rebuild Bridge C–1.3 at a cost of $275,000.

With this contention, we agree. Burlington Northern is not obligated to rebuild the bridge. Rather, it is bound only to maintain rail access to the warehouse in some manner, and rebuilding the bridge now appears to be the most feasible means of doing so, although an expensive one. The law does not require economic waste. Burlington Northern is perfectly free to forego rebuilding the bridge or otherwise providing rail access to the warehouse. But in that case it is liable for damages for breach of the lease contract, consisting of the difference between the value of the leasehold interest in the warehouse as promised, with access to rail transportation, and the actual value of the leasehold interest in the warehouse as now situated, without rail access after the 1981 bridge closing. *See Yakima Lodge No. 53, Knights of Pythias v. Schneider,* 173 Wash. 639, 640, 24 P.2d 103, 104 (1933); *Belt v. Washington Water Power Co.,* 24 Wash. 387, 395, 64 P. 525, 527 (1901).

### B. Defenses to the Contract Obligation.

Burlington Northern has suggested three possible defenses to the obligation created by the lease covenant: (1) hardship, (2) illegality, and (3) considerations of public interest based on Burlington Northern's status as a common carrier.

### 1. Hardship.

When the warehouse lease was created in 1956, the term requiring the railroad to maintain rail service to the warehouse appeared reasonable to both parties. With the succeeding years, circumstances have changed dramatically. Relocation of the main rail line and the discontinuation of all other rail customers on the Taylor-Edwards side of the Spokane River, coupled with the predictable deterioration of Bridge C–1.3, have made performance of the rail service

---

5. Once standard in Burlington Northern's leases, this provision was declared illegal as a violation of the antitrust laws in a 1971 judicial proceeding. The illegality of the provision does not, however, affect the significance of the phrasing as it bears on determining the intentions of the parties in 1956 when the lease was entered.

obligation quite burdensome. Burlington Northern has consistently cited the expense of repairing the bridge, necessary as a practical matter to continue rail service to the warehouse, as the important reason why rail service should not be required under the lease. Essentially, Burlington Northern seeks to interpose a defense of hardship.

Under the common law, a hardship defense to the contractual obligation to perform is recognized only if the difficulty rises to the level of "impossibility." 18 *Williston on Contracts* § 1963, at 182 (3d ed. 1978); *see* 6 *Corbin on Contracts* § 1320, at 322 (1962 ed.). The traditional rule was aptly restated by this court in *Kiyoichi Fujikawa v. Sunrise Soda Water Works Co.,* 158 F.2d 490, 493 (9th Cir.1946):

> Difficulty or improbability of accomplishing the stipulated undertaking will not avail the obligor. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance. The courts will not consider hardship or the expense or loss to the one party or the meagerness or uselessness of the result to the other.

(emphasis, citation deleted).

More modern cases dealing with the issue have exhibited a trend away from the harshest application of this doctrine, to allow a defense where performance would be extremely costly or onerous although not literally impossible. ·*See* 18 *Williston, supra,* § 1963, at 178; 6 *Corbin, supra,* § 1320, at 321–22. However, the impossibility doctrine does not extend to excusing Burlington Northern's performance in the present case. Washington courts continue to follow the general rule that "[t]he mere fact that a contract's performance becomes more difficult or expensive than originally anticipated, does not justify setting it aside." *Liner v. Armstrong Homes,* 19 Wash.App. 921, 926, 579 P.2d 367, 370 (1978). The ultimate inquiry for purposes of the impossibility defense is whether the intervening changes of circumstance were so unforeseeable that the risk of increased difficulty or expense should not properly be borne by the promisor.[6] 18 *Williston, supra,* § 1963, at 180; 6 *Corbin, supra,* § 1322, at 330.

We are particularly chary of applying the defense of impossibility to relieve Burlington Northern of its obligation here, where the expense inherent in performance primarily resulted from Burlington Northern's own decision to abandon the main rail line that formerly crossed the Spokane River. Courts have uniformly refused to find impossibility where the difficulty has been caused by the promisor, *see, e.g., Gulf, Mobile and Ohio Railroad Co. v. Illinois Central Railroad Co.,* 128 F.Supp. 311, 324 (N.D.Ala. 1954), *aff'd,* 225 F.2d 816 (5th Cir.1955), or where the difficulty was preventable by the promisor, *see, e.g., id.; Liner,* 19 Wash.App. at 927–28, 579 P.2d at 371. *See generally* Annot., 84 A.L.R.2d 12, 62–64 (1962). The damages resulting from Taylor-Edwards's inability to ship by rail to and from the warehouse represent a cost inevitably imposed by Burlington Northern's decision to abandon the Great Northern main line. We see no reason in contract law why Burlington Northern should not be required to bear this cost.

## 2. *Illegality.*

Burlington Northern suggests that it cannot be required to honor a contract provision requiring continued rail service to the Taylor-Edwards warehouse, because any such provision would be a concession to a shipper prohibited by the anti-discrimination provisions of the Elkins Act, 49 U.S.C. §§ 11901–11917 (Supp. V 1981). This contention requires no extended discussion. Under some circumstances, a real estate transaction between a railroad and a shipper can constitute a discriminatory re-

---

**6.** If, for example, Burlington Northern had properly maintained Bridge C–1.3, but the bridge was destroyed by a natural disaster, the case might be appropriate for application of the impossibility defense.

bate prohibited by the Elkins Act. *E.g., United States v. Michael Schiavone & Sons,* 430 F.2d 231, 233 (1st Cir.1970) (property sold at price lower than other buyers would pay on open market); *United States v. Food Fair Stores,* 417 F.2d 62, 64 (5th Cir. 1969) (railroad provided interest-free purchase money loan). This is not such a case. The standard for assessing whether a lease violates the Elkins Act is whether the consideration reflects a fair rental value. *Union Pacific Railroad Co. v. United States,* 313 U.S. 450, 473, 61 S.Ct. 1064, 1077, 85 L.Ed. 1453 (1941). No contention has been raised that in 1956, when the lease was entered, $200 per month was not a fair rental for a warehouse with access to rail transport facilities. The lease contract, in hindsight, has proven beneficial to Taylor-Edwards. But the realization of such a benefit does not violate the Elkins Act in the absence of any allegation or showing that the railroad would not have accorded any other shipper the same terms on leases of similarly situated property. *See Continental Shippers' Association v. United States,* 328 F.2d 966, 968–69 (9th Cir.1964).

C. *Considerations of Public Interest Based on Burlington Northern's Status as a Common Carrier.*

Burlington Northern finally maintains that it should be excused from the obligation to maintain rail service to the Taylor-Edwards warehouse because paying the cost of continued service would be contrary to the public interest. In essence, we interpret the railroad's position to be that because it is a common carrier, operating in interstate commerce and regulated by the Interstate Commerce Commission, a contract that forces Burlington Northern to make an expenditure unwarranted by the public interest may constitute an undue burden on interstate commerce. If so, then state contract law that would require the

expenditure is preempted by the body of federal law protecting and regulating interstate commerce.

The Supreme Court examined a similar contention in *Central New England Railway Co. v. Boston & Albany Railroad Co.,* 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770 (1929). In that case, Central New England obtained permission from Boston & Albany to operate trains over a segment of Boston & Albany track for a 40 year period, in exchange for an annual rental of $15,000. Twenty years later, New England Central obtained from the ICC a certificate of public convenience and necessity allowing the railroad to discontinue service over a branch line connecting to the Boston & Albany route, on the grounds that the branch line could not be operated except at a large annual loss and that other available facilities had rendered its continuance unnecessary. *Id.* at 417, 49 S.Ct. at 358–59. Central New England was sued after failing to make the annual payments required by the lease contract, and defended with the claim that the broad powers conferred on the ICC evidenced a congressional purpose to confer upon the ICC power to relieve a carrier of contractual obligations related to the operation of a rail segment for which the Commission has given permission to abandon. Central New England reasoned that such relief must be inherent in a grant of ICC permission to abandon, because the obligation to make further payments would reduce the railroad's revenues and thus burden its other commerce.

The Court refused to accept Central New England's position. The Court declined to rule on the question whether the ICC has authority to relieve a carrier of burdensome contractual obligations.[7] *Id.* at 418, 49 S.Ct. at 359. Instead, it rested its holding that Central New England could be liable on the contract upon the fact that the certificate and accompanying report of the Commis-

---

7. In the past, however, the ICC has taken the position that it lacks authority to relieve a carrier of contractual obligations. *See, e.g.,* *Gulf, Mobile & Ohio R.R. Co. v. Illinois Cent. R.R. Co.,* 128 F.Supp. 311, 315 (N.D.Ala.1954), *aff'd,* 225 F.2d 816 (5th Cir.1955).

sion did not purport to exercise such a power. Without such a conflict between a contract provision and an ICC order, the Court concluded that there is no justification for holding that an order authorizing abandonment operates *sub silentio* to release a carrier from a contract. *Id.* at 420, 49 S.Ct. at 359–60.

In *Gulf, Mobile and Ohio Railroad Co. v. Illinois Central Railroad Co.,* 225 F.2d 816 (5th Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 303, 100 L.Ed. 815 (1956), another court dealt with a situation where a railroad abandoned a leased stretch of railroad pursuant to ICC order, and then attempted to obtain a ruling that it was free from the contractual rent obligation. Following *Central New England Railway,* the Fifth Circuit held that because the ICC order did not purport to affect the trackage lease, the order did not abrogate the lease obligations. *Id.* at 821–22. The court further interpreted *Central New England* to reject "the contention that the policy of the Interstate Commerce Act ... achieved this result, even though no such action was taken by the Commission." *Id.* at 822 (citation, footnote omitted).

■■■ The present case is still less favorable to the railroad seeking to escape its contractual obligation than *Central New England* and *Illinois Central Railroad.* The ICC has not, as in those cases, issued a certificate authorizing abandonment of the rail spur extending across the Spokane River to the Taylor-Edwards warehouse.[8] It follows that the ICC certainly has not made any attempt to excuse Burlington Northern from its duty to provide rail access to the Taylor-Edwards warehouse for the duration of the lease. On the authority of *Central New England,* we conclude that the public interest component of Burlington Northern's operation as a common carrier is not by itself a sufficient basis for relieving Burlington Northern of the obligation to give Taylor-Edwards its expectancy under the lease.[9]

## III

## CONCLUSION

The provision in the Taylor-Edwards warehouse lease in which the lessor promised "to maintain, operate and make available for use by Lessee" the siding next to the warehouse requires Burlington Northern to maintain effective rail access from a main line to the siding. Since reference to extrinsic evidence is not needed to interpret the lease contract,[10] the issue is solely one of law, and no issue of fact remains that would require trial. *See Culinary & Service Employees Union, Local 555 v. Hawaii Employee Benefit Administration,* 688 F.2d 1228, 1230 (9th Cir.1982); *Martin v. United*

---

8. Both parties agree that because the abandoned line was purely intrastate "spur" track, the ICC would not in any event have jurisdiction to rule on the abandonment. *See* 49 U.S.C. § 10907(b)(1) (Supp. V 1981).

9. *Humphrey Feed & Grain, Inc. v. Union Pac. R.R. Co.,* 199 Neb. 189, 257 N.W.2d 391 (1977), is not to the contrary. In that case the court, after discussing the doctrine of primary ICC jurisdiction, ruled that the defendant railroad had no duty under state law to repair and maintain a functional side track. However, the court's conclusion was expressly premised on the fact that "[t]he lease is silent in regard to the sidetrack." 257 N.W.2d at 402. Thus, the court ruled that no duty to maintain the side track ever arose under state law.

Likewise, Burlington Northern's position is not supported by *Chicago & N.W. Transp. Co.*

*v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). While the Court in that case ruled that a plaintiff's state law recovery for abandonment was preempted by the ICC's jurisdiction, the plaintiff's state law causes of action were not based on any theory of contract. *Id.* at 322–24, 101 S.Ct. at 1132–34. The Court's holding of preemption was expressly based upon the fact that the state law claims turned upon the same issues of "reasonableness" and "tortious motive" that had been resolved in a prior ICC abandonment proceeding. *See id.* at 326–27, 101 S.Ct. at 1134–35.

10. Both parties agree that no extrinsic evidence is needed or relevant to interpret the disputed lease provision.

*States,* 649 F.2d 701, 703 (9th Cir.1981). Because Burlington Northern has not raised any defense that might prevail as a matter of law, the district court should have granted summary judgment on the liability issue as requested by Taylor-Edwards. The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED.