In the Matter of CHICAGO, ROCK IS-LAND AND PACIFIC RAILROAD COMPANY, Debtor.

Appeal of TEXAS NORTH WESTERN RAILWAY COMPANY, Petitioner–Appellant,

v.

DIAMOND SHAMROCK REFINING AND MARKETING COMPANY and The Atchison, Topeka and Santa Fe Railway Company, Respondents–Appellees.

No. 87–3102.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1988.

Decided Dec. 12, 1988.

Roland A. Eckert, Epton, Mullin & Druth, Ltd., Chicago, Ill., for petitioner-appellant.

J. Mark Fisher, Schiff Hardin & Waite, Chicago, Ill., for respondents-appellees.

Before BAUER, Chief Judge, WOOD, Jr. and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Texas North Western Railway Company (TNW) petitioned the district court for the enforcement of two orders that the court entered during its supervision of the reorganization of the Chicago, Rock Island and Pacific Railroad Company (Rock Island). The orders (Order No. 443 and Order No. 519) approved the conveyance to TNW of Rock Island's interests in 97.4 miles of railway. On cross-motions for summary judgment,[1] the district court concluded that the orders themselves created no substantive property rights in favor of TNW and that Rock Island possessed no property or contractual interests in the right-of-way at

---

1. The Atchison, Topeka and Santa Fe Railway Company (Santa Fe) moved separately for summary judgment against TNW. The district court also granted its motion. On appeal, Santa Fe and Diamond Shamrock have filed a joint brief.

issue in this case that it could have transferred to TNW. We affirm.

## I

### Facts

This case involves TNW's claim to a one-mile strip of land in Section 399 of Moore County, Texas. The one-mile strip is a right-of-way at the end of 97.4 miles of railway that the Rock Island trustee conveyed to TNW in November 1982 by a "deed without warranty of any kind." The right-of-way consisted of the final portion of an industry spur servicing the Diamond Shamrock facilities in Section 399. The sale of Rock Island's rights in this railway to TNW was approved by the district court in Order No. 443, and a modification of the terms of the sale was approved in Order No. 519. When TNW attempted to provide service to the Diamond Shamrock facilities, its access was barred. TNW argues that, by barring its access to the Section 399 right-of-way and allowing Santa Fe access to its plant, Diamond Shamrock has violated its rights under the court orders approving the sale.

The circumstances surrounding Rock Island's acquisition of the one-mile strip and its subsequent treatment of that property are crucial to our analysis of the issues presented by this appeal. Rock Island received different property interests in the north and south halves of Section 399. Rock Island acquired its interest in the north half by a deed ("the Garland Deed") containing a reversion clause. That clause provided that the property would revert to the grantors or their successors "in the event said property ceases to be used for railroad purposes." This deed is dated December 11, 1936.

Rock Island's property interest in the south half is limited to its interest in a 40–year lease conveyed to it by Diamond Shamrock. Diamond Shamrock acquired the lease in 1936, and conveyed it to Rock Island by a series of instruments in 1937 and 1938. Rock Island's leasehold, therefore, expired in 1976 at the end of the lease term. TNW, however, claims a continuing contractual interest in the disputed right-of-way on the basis of ten contracts for the construction, operation, maintenance, extension, and relocation of track entered into by Diamond Shamrock and Rock Island between 1936 and 1969. *See* Appellant's Br. at 7–9; Appellees' Br. at 4–5.

Rock Island filed for bankruptcy in 1975. On August 23, 1979, a Rock Island derailment destroyed 1000 feet of track on the spur in Section 399. This derailment cut off the Diamond Shamrock facilities from rail service. Five days later, a strike forced Rock Island to discontinue service. Although Rock Island's contracts with Diamond Shamrock contained a repair obligation, Rock Island failed to make the necessary repairs. Diamond Shamrock was forced to make the repairs at its own expense and to arrange for alternative transportation of material into and out of its facilities. Trucks were used to carry material between the Diamond Shamrock facilities and the Santa Fe main line at Etter, Texas.

Service by Rock Island itself never resumed. Service, however, was resumed temporarily by a consortium of railroads acting as "directed service carriers" pursuant to ICC order. In March 1980, all rail service stopped. This prompted Diamond Shamrock to operate its own rail service through a private contractor. Rock Island's failure to provide any maintenance to the tracks forced Diamond Shamrock to engage in a substantial program of track repair and reconstruction. *See* Appellees' Br. at 6–9. This repair work included the replacement of a trestle destroyed by a flood at a cost of $234,000. Ultimately, Diamond Shamrock arranged for Santa Fe to oversee the rebuilding of the track in Section 399. In October 1981, Santa Fe itself began providing rail service to Section 399 pursuant to agreements with Diamond Shamrock.

Sale negotiations between the Rock Island trustee and TNW's predecessor corporation (TeCe) began in 1980. During these negotiations, the parties were aware of the ongoing relationship between Diamond Shamrock and Santa Fe. *See* Appellees' Br. at 9. The district court finally ap-

proved the sale agreements growing out of these negotiations in Order No. 443 as modified by Order No. 519.

## II

### Analysis

TNW raises two basic claims on appeal. First, it asserts that the district court erred in concluding that Order No. 443 and Order No. 519 did not give TNW a substantive right to operate rail service on the rail spur in Section 399. Second, it maintains that the district court erred in determining that Rock Island possessed no interest capable of being conveyed to TNW. TNW argues that Rock Island possessed a property interest in that part of the one-mile strip located in the north half of Section 399 and retained contract rights in the south half. We shall address each of these claims separately.

### A. *Effect of the District Court Orders Approving the Sale of Rock Island's Interests to TNW.*

Order No. 443, entered on March 15, 1982, approved the sale of Rock Island's interest in the right-of-way at issue to TNW. The order provided that, upon execution and delivery of a quitclaim deed by the Rock Island trustee, TNW would have "the right to immediate possession and quiet enjoyment of the track." R. 10C, Ex. 27 at 3. The order also enjoined all persons or entities from interfering with or disturbing TNW's "possession and quiet enjoyment." *Id.* Order No. 519 modified the form of the deed of conveyance of the rail properties. That order, entered on November 15, 1982, approved a modification agreement providing for conveyance of the properties by "a deed without warranty of any kind (whether express or implied)." R. 10C, Ex. 28 at 3.[2]

TNW maintains that Order No. 443 gave it a substantive right to operate rail service free from third-party interference and that the modification approved in Order No. 519

did nothing to alter that substantive right. Its claim that Order No. 443 recognized a substantive right held by TNW in the Section 399 right-of-way apparently is based on the warranty and injunctive language contained in that order. *See* Appellant's Reply Br. at 1. TNW further argues that the modification approved in Order No. 519 did not extinguish the substantive right recognized in the earlier order. The deed "without warranty of any kind" authorized by Order No. 519 changed the form, but not the substance, of the Rock Island trustee's conveyance to TNW. TNW asserts that this change was only formal because "[t]here is no difference between a quitclaim deed and the Trustee's deed without warranties." Appellant's Br. at 14.

The district court rejected TNW's reliance on Order No. 443 as a source of any substantive right to the disputed trackage. *In re Chicago, R.I. & P.R.R.*, No. 75 B 2697, mem. op. at 3–4 (N.D.Ill. Aug. 17, 1987); R. 34 at 3–4 [hereinafter Mem. op.]. That court expressly stated on two occasions that "title to the right-of-way at issue was not adjudicated, discharged, or resolved by this court as of the consummation of the Rock Island bankruptcy." Mem. op. at 3; *see also In re Chicago, R.I. & P.R.R.*, No. 75 B 2697, mem. op. at 3 (N.D.Ill. Nov. 1, 1985); R. 6 at 3. In addition, the district court held that Order No. 519 "negates the warranty language in Order No. 443." Mem. op. at 3.

We agree with the district court's interpretation of Order No. 443 and Order No. 519 and conclude that those orders left the question of title to the Section 399 right-of-way unresolved. We shall not reverse a district court's interpretation of its own order "unless the record clearly shows an abuse of discretion." *Arenson v. Chicago Mercantile Exch.*, 520 F.2d 722, 725 (7th Cir.1975). The district court is in the best position to interpret its own orders. *See Vaughns v. Board of Educ.*, 758 F.2d 983, 989 (4th Cir.1985); *United States v. Board of Educ.*, 717 F.2d 378, 382 (7th

---

**2.** The modification agreement went on to state that, "The Trustee shall in no event incur liability to TNW Railway for failure of or defect in the title or estate of the Trustee in and to the rail properties conveyed." R. 10C, Ex. 28 at 3.

Cir.1983) ("Few persons are in a better position to understand the meaning of a [court order] than the district judge who oversaw and approved it."). We have applied this principle in the railroad reorganization context: "The district court best knows the meaning of its own orders. The meaning of these documents is reasonably clear; even if it were not, we would defer to the district court's construction of them." *In re Chicago, M. St. P. & P.R.R.,* 784 F.2d 831, 834–35 (7th Cir.1986). Therefore, deference to the district court's interpretation of the orders at issue in this case is appropriate.

Even if TNW is correct in asserting that Order No. 519 changed only the form of the conveyance approved in Order No. 443, we could not conclude that the injunctive language of Order No. 443 itself created some substantive right. Rather, the injunctive language in the order protected those substantive rights, if any exist, that TNW received from the Rock Island trustee. Order No. 443 provided for conveyance by quitclaim deed. Such a deed is "intended to pass any title, interest, or claim which the grantor may have in the premises, but [does] not profess[ ] that such title is valid, nor [does it] contain[ ] any warranty or covenants for title." Black's Law Dictionary 1126 (5th ed. 1979). *See also Woodward v. Ortiz,* 150 Tex. 75, 237 S.W.2d 286, 291 (1951) (purchaser by quitclaim deed buys "only a chance of title"). Thus, the quitclaim deed authorized by Order No. 443 (as with the deed without warranty of any kind of Order No. 519) only passed—and the injunctive language of that order only protected—whatever interest Rock Island actually possessed and was capable of conveying. The district court, therefore, was correct in concluding that the language alone of the orders did not create any substantive interest in TNW.

**B. *Nature of Rock Island's Interest in the Section 399 Right-of-way***

The district court accepted Diamond Shamrock's contention that TNW acquired no interest in the Section 399 right-of-way because, at the time of conveyance to TNW, Rock Island itself had no interest to transfer. TNW maintains that Rock Island possessed both property and contractual interests in the right-of-way.

**1. Property Interest**

Because Rock Island's leasehold interest in the south half of Section 399 expired in 1976 at the end of the lease term, Rock Island's only property interest in the right-of-way was based on the 1936 Garland Deed to the property in the north half.[3] The district court found that Rock Island had ceased using that property "for railroad purposes," thus causing title to that portion of the right-of-way to revert under the provisions of the 1936 deed.

TNW advances two arguments in support of its contention that Rock Island prevented any reversion under the Garland Deed by continuing to use the Section 399 property "for railroad purposes." First, TNW argues that the phrase "used for railroad purposes" should be broadly interpreted to include activities short of the actual operation of train service. TNW reasons that, by holding the property for sale as an operating rail line and actually negotiating such a sale, the Rock Island trustee was using the property for a legitimate railroad purpose. Second, TNW maintains that the property was actually used for railroad purposes even after Rock Island stopped providing service itself. The directed service carriers acting under ICC order, Diamond Shamrock (through independent contractors), and Santa Fe all

---

**3.** Mem. op. at 8. The Garland Deed provided in pertinent part:

> Alice Garland and Walter Garland ... do hereby release and forever discharge [the Rock Island Railway Company], [its] successors and assigns, of any and all damages arising out of, or which may arise or grow out of the construction, maintenance or operation of any and all tracks to the above property and a

continuing grant for railroad purposes is hereby granted, subject only to the terms and conditions of any and all oil and gas leaseholds now on said property, *with the reservation that in the event said property ceases to be used for railroad purposes, same shall revert to the grantors, their heirs, executors, administrators or assigns.*

R. 10C, Ex. 13; R. 17, Ex. 8 (emphasis supplied).

used the track in Section 399 for the actual operation of train service. Since the Garland Deed reversionary clause does not say that the property must be used *exclusively* by Rock Island for railroad purposes, TNW argues that the district court erred in holding that the property had reverted to the grantor.

■ The district court correctly concluded that Rock Island triggered the reversion clause by failing to use the right-of-way for railroad purposes. The court properly noted that resolution of the reversion issue turns on the particular language of the deed and the facts of this case. In addition, interpreting the language in a right-of-way grant requires courts to "endeavor to arrive at and enforce the intention of the parties." *Zobrist v. Culp*, 95 Wash.2d 556, 627 P.2d 1308, 1310 (1981) (en banc) (relying upon *Missouri–Kansas–Texas R.R. v. Freer*, 321 S.W.2d 731, 739 (Mo.Ct.App. 1958)). If the language of the grant itself leaves the intention of the parties doubtful, then "the situation and circumstances of the parties at the time of the execution of the grant" must be considered in order to "learn what was within [the parties'] contemplation at that time." *Freer*, 321 S.W. 2d at 739. In this case, the language of the grant and the apparent "situation" of the parties at the time of the execution of the Garland Deed both support a finding of reversion.

The evidence in the record amply demonstrates that Rock Island was not *using* the property for any railroad purpose. Rock Island rail service to the Diamond Shamrock facilities along the disputed right-of-way had ceased by March 1980. R. 17, Ex. 2 at 3. The damage caused by the 1979 Rock Island derailment destroying 1000 feet of track was never repaired by Rock Island. Rock Island refused to make these repairs despite a request from Diamond Shamrock that it do so. *Id.* at 2. In addition, Rock Island's failure to maintain its tracks led to deterioration in their condition. R. 17, Ex. 1 at 2–3. Diamond Shamrock's need for continued rail service forced it to operate trains over this deteriorated track. The resulting hazardous conditions made derailments a common occurrence. *Id.* at 3.

Under these circumstances, it was reasonable for the district court to conclude that merely holding the property while conducting sale negotiations, without providing any maintenance or service, did not constitute a use for railroad purposes. "Use" implies more active conduct than holding property for future disposition. "To 'use' is not synonymous with 'to hold' or 'to maintain.' ... It means to employ, to put into action or service." *Zobrist*, 627 P.2d at 1311. Rock Island clearly was not employing, or putting into action, the Section 399 right-of-way.

The terms of the grant itself also suggest that a more active use "for railroad purposes" was contemplated by the parties. The grant discharged Rock Island from liability for "all damages arising out of, or which may arise or grow out of the construction, maintenance or operation of any and all tracks to the ... property." R. 10C, Ex. 13; R. 17, Ex. 8. Thus, the grantors anticipated the actual use and maintenance of any tracks constructed on the right-of-way. This reading of the grant is supported by the circumstances surrounding the execution of the Garland Deed. The deed conveyed to Rock Island the right-of-way for part of a spur extension that Rock Island agreed to construct in a December 1936 contract. *See* R. 10C, Ex. 2 at 3.[4] This extension was required by the Shamrock Oil & Gas Corp. (Shamrock) in order to service a crude oil refinery that it

---

**4.** Section 3 of the 1936 contract provided:
   Before the construction of said switching lead is commenced by [Rock Island, Shamrock] shall at its sole cost provide a right of way therefor fifty (50) feet in width and deliver to [Rock Island] good and sufficient unencumbered title therefor by deed of conveyance or easement which shall be acceptable to [Rock Island]. . . .

R. 10C, Ex. 2 at 3. A comparison of the property description in the Garland Deed and the specifications of the rail extension in the 1936 contract shows that the Garland Deed provided part of the right-of-way for that extension. *See also* R. 10B at 6.

proposed to build one mile south of a four-mile spur that Rock Island had agreed to build in a September 1935 contract. *See* R. 10C, Ex. 2 at 1; R. 10C, Ex. 1. The 1935 contract was intended to serve several industries in the vicinity of a Shamrock gasoline extraction plant in Section 399. This contract stated that, "for the profitable operation of these consolidated industries, railroad service is the primary requirement." R. 10C, Ex. 1 at 2. Therefore, it is unlikely that holding the property for future disposition was a railroad purpose contemplated by the parties to the grant.

▆▆▆▆ We also reject TNW's argument that the continued use of the track in Section 399 by operators other than Rock Island prevented the reversion clause from being triggered. A reasonable reading of the reversion clause requires us to conclude that the property would revert when the *grantee* ceased using the property for railroad purposes. The reversion clause was designed to protect Diamond Shamrock's need for railway service. It would make little sense for a deed to contain a reversion clause divesting the Rock Island of ownership for failure to provide such service and then negate such a reversion because Diamond Shamrock, the protected party, had secured alternate service. Thus, Diamond Shamrock's use of the property for railroad purposes cannot preserve the ownership rights of Rock Island. *Cf. Corrado v. Consolidated Rail Corp.*, 648 F.Supp. 1004 (Regional Rail Reorg.Ct.1986) (no interest passed to a successor railroad, since the grantee railroad's cessation of service led to forfeiture of its right to

operate on a spur track even though the surrounding property owner continued operation on the spur track). We conclude, therefore, that Rock Island possessed no property interest in the right-of-way that it could have conveyed to TNW.[5]

### 2. Contract Interest

▆▆▆▆ TNW bases its claim to access to the disputed right-of-way in the south half of Section 399 on a series of main line and industry track contracts between Rock Island and Diamond Shamrock. As already discussed, the main line contracts, entered into in 1935 and 1936, provided for the construction of a main line spur servicing the Diamond Shamrock facilities in Section 399. These contracts mandated that the tracks constructed by Rock Island "shall be and remain [Rock Island's] sole property and *will be operated* in conjunction with [the Rock Island] system of railways." *See* R. 10C, Ex. 1 at 4; R. 10C, Ex. 2 at 3 (emphasis supplied).[6] The industry track agreements provided for the construction, operation, maintenance, extension, and relocation of track providing rail access from the main line spur into the industry facilities themselves. These contracts obligated Rock Island to construct, maintain, and operate over specific lengths of track. The costs of construction and maintenance, however, were apportioned between the parties—Rock Island was responsible for those costs related to track lying within its right-of-way, while Diamond Shamrock was responsible for the costs associated with tracks lying on its property.[7]

---

5. In addition, we note in passing that Rock Island's conduct does not fall within the broad interpretation of "used for railroad purposes" espoused in *Zobrist*. The *Zobrist* court reasoned that various activities short of the actual operation of train service could constitute use for railroad purposes. For example, "[h]olding the track for possible use in case of request for services, or maintaining the track for future use, or running work trains or cars over it, may constitute a 'railroad purpose.'" 627 P.2d at 1311. Rock Island was neither "maintaining the track for future use" nor "holding the track for possible use in case of request for services." As the district court noted: "Shamrock needed rail service. None was provided. The Rock Island did not maintain the track for future use,

but allowed it to deteriorate." Mem. op. at 8. Even under a generous reading of the terms of the grant, the district court correctly held that Rock Island failed to use the property "for railroad purposes," thus triggering the reversion clause of the Garland Deed.

6. The 1936 main line contract describes the 1935 contract as an agreement "relative to the construction, ownership, maintenance, operation and use of ... track...." R. 10C, Ex. 2 at 1.

7. *See, e.g.,* R. 10C, Ex. 10 at 1-2. TNW itself recognized that costs were apportioned in this manner. In its brief, it noted that "[a]pportionment of track construction and *maintenance*

The district court determined that Rock Island's conduct constituted an anticipatory breach of these contracts. Mem. op. at 10–11. It based this determination on Rock Island's cessation of service after March 1980, its failure to maintain the tracks, and its refusal to repair a washed out trestle and the damage caused by the 1979 derailment. The district court concluded that the breach of these contracts terminated Rock Island's rights and obligations under them, thus divesting Rock Island of any contract interest that could be conveyed to TNW.

TNW asserts that the district court erred in determining that an anticipatory breach had taken place because Rock Island could not realistically have been expected to fulfill its contract obligations. *See, e.g.,* Appellant's Reply Br. at 10. For example, five days after the August 1979 derailment, Rock Island employees went on strike and forced the railroad to discontinue operations. TNW maintains that Rock Island could not have performed the necessary repairs in the brief period between the derailment and the strike. In addition, the district court's order mandating system-wide abandonment of the Rock Island rail network forced the railroad to cease operations and precluded it from raising the cash necessary to perform repairs and maintenance. Such costs traditionally were satisfied with the proceeds from rail operations. *See* Appellant's Br. at 18 & n. 3.

The district court was correct in its determination that Rock Island's conduct amounted to an anticipatory repudiation and breach of the contracts upon which TNW relies. Under Texas law, anticipatory repudiation of a contract is established where actions of a party indicate an intention that it "is not going to perform the contract according to its terms in the future." *Builder's Sand, Inc. v. Turtur,* 678 S.W.2d 115, 120 (Tex.Ct.App.1984). Rock Island's cessation of rail service over tracks upon which it had agreed to operate and its failure to prevent the deterioration of, and perform necessary repairs on, track that it was obligated to maintain reasonably can be seen as manifestations of an intention not to perform its contract promises in the future. The district court also properly concluded that any performance difficulties presented by the Rock Island employees' strike did not excuse Rock Island's failure to meet its contractual obligations. Mem. op. at 11; *see, e.g., Taylor-Edwards Warehouse & Transfer Co. v. Burlington N., Inc.,* 715 F.2d 1330, 1336 (9th Cir.1983) ("mere fact that a contract's performance becomes more difficult or expensive than originally anticipated, does not justify setting it aside") (quoting *Liner v. Armstrong Homes, Inc.,* 19 Wash.App. 921, 579 P.2d 367, 370 (1978)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. B.C. Rogers & Sons, Inc.,* 696 F.2d 1113, 1115 (5th Cir.1983) ("inconvenience or unex-

*costs* is based on ownership of the right-of-way." Appellant's Br. at 8 (emphasis supplied). In spite of this recognition that Rock Island did bear at least some track maintenance costs, TNW asserted at oral argument that no breach of the contracts had occurred since Rock Island was "not financially responsible" for any of the repairs requested by, or ultimately performed by, Diamond Shamrock and Santa Fe. This argument was not presented to the district court and the factual basis essential to disposition of this argument was not developed by counsel for TNW during oral argument. This issue was improperly raised for the first time on appeal, and was therefore waived by TNW. *See Dunker v. Reichman,* 841 F.2d 177, 180 n. 3 (7th Cir. 1988); *Morris v. Jenkins,* 819 F.2d 678, 681 (7th Cir.1987) (per curiam); *see also* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2716 at 650–54 (2d ed. 1983) (on appellate review of summary judgment the parties "cannot ... advance new theories ... in order

to secure a reversal"). We note, however, that TNW's assertion of no financial responsibility flies in the face of the facts and the terms of the contracts. For example, the 1979 Rock Island derailment destroyed 1000 feet of main line spur track in the *north half* of Section 399. This is track located on right-of-way owned by Rock Island until the reversion clause of the Garland Deed was triggered. Thus, Rock Island did bear financial responsibility for the maintenance costs of this section of track. In addition, Rock Island bore the responsibility of performing maintenance even on those sections of industry track for which it was not actually financially responsible. The industry track contracts provided that Diamond Shamrock would "pay to the Railroad the amount of bill or bills rendered to [Diamond Shamrock] by Railroad for such maintenance" performed on that portion of the track lying on Diamond Shamrock property. *See* R. 10C, Ex. 10 at 2.

pected hardship will not release a party from his contract"); *Gulf, M. & O.R.R. v. Illinois Cent. R.R. Co.*, 128 F.Supp. 311, 323–24 (D.Ala.1954) (performance excused when impossibility of performance grows out of "the nature of the thing to be done"; mere "incapacity or inability of the promisor to [perform]" is not sufficient), *aff'd*, 225 F.2d 816 (5th Cir.1955), *cert. denied*, 350 U.S. 932, 76 S.Ct. 303, 100 L.Ed. 815 (1956). Similarly, Rock Island's abandonment of its rail network did not excuse its failure to provide maintenance under these contracts. *Cf. Taylor–Edwards Warehouse*, 715 F.2d at 1337–38 (where ICC abandonment order did not relieve carrier of burdensome contractual obligations, no reason to hold that order authorizing abandonment operates *sub silentio* to release a carrier from a contract) (discussing *Central N.E. Ry. v. Boston & A.R.R.*, 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770 (1929)).

■ Rock Island's breach by anticipatory repudiation relieved Diamond Shamrock of its obligations under the contracts and allowed it to treat the contracts as terminated. *See Builder's Sand*, 678 S.W. 2d at 120; *Miller v. Puritan Fashions Corp.*, 516 S.W.2d 234, 237–38 (Tex.Civ. App.1974); *Lufkin Nursing Home, Inc. v. Colonial Inv. Corp.*, 491 S.W.2d 459, 463 (Tex.Civ.App.1973) ("When one party to an agreement has repudiated it, the other party may then accept the agreement as being terminated...."); *see also American Hosp. Supply v. Hospital Prods. Ltd.*, 780 F.2d 589, 599 (7th Cir.1986) (if a material breach has been committed, the innocent party is "entitled to terminate the contract as a means of self-help"). The fact that Rock Island had filed a bankruptcy petition in 1975 did not prevent Diamond Shamrock

from treating the contracts as terminated. A bankruptcy trustee "cannot accept the benefits of an executory contract without accepting the burdens as well." *Schokbeton Indus. v. Schokbeton Prods. Corp.*, 466 F.2d 171, 175 (5th Cir.1972). Therefore, "[i]f the debtor has committed, or the trustee commits, an incurable breach, the trustee has no continuing rights under the contract." *In re Trigg*, 630 F.2d 1370, 1374 (10th Cir.1980); *Good Hope Refineries v. Benavides*, 602 F.2d 998, 1003 (1st Cir.), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979). Diamond Shamrock's conduct in the wake of Rock Island's failure to perform demonstrates both that the Rock Island breaches were incurable and that Diamond Shamrock had chosen to treat the contracts as terminated. Diamond Shamrock spent large sums of money to repair the damaged and deteriorating track, provided its own alternative rail service through an independent contractor, and ultimately contracted with Santa Fe to provide the rail service that it needed. Diamond Shamrock thus had changed position substantially in reliance on Rock Island's repudiation of the contracts, precluding Rock Island (or its purported assignee, TNW) from effectively curing its default. Because Diamond Shamrock had treated the contracts as terminated, Rock Island possessed no contractual interest that it could convey to TNW.[8]

■ Rock Island was also incapable of conveying any valid contractual interest to TNW because the Rock Island trustee failed to assume the railroad's executory contracts in the manner mandated by Order No. 1. That order required that any assumption of an executory contract

---

**8.** TNW also argues that the district court's decision that the contracts had been repudiated and terminated is inconsistent with its earlier orders. TNW maintains that, by treating the contracts as terminated, Diamond Shamrock violated the injunctive language of Order No. 1, entered by the district court on March 17, 1975. That order "restrained and enjoined" all persons and corporations "from interfering with ... or in any manner whatsoever disturbing any portion of the assets, ... interests, ... properties or premises belonging to, or in the possession of

the Debtor...." R. 10C, Ex. 19 at 11–12. The district court rejected this argument, holding that Diamond Shamrock's decision to treat the contracts as terminated "fell outside the injunctive scope of order 1." Mem. op. at 12–13. The district court concluded that Rock Island's repudiation of the contracts itself terminated its possession of any interest under those contracts. We agree. Moreover, we defer to the district court's interpretation of its own orders. *See* Part II.A *supra*.

*shall be made* by instrument in *writing* .... *No* occupancy, *conduct*, or use of property or rights by the Debtor ... *except an instrument* [delivered to the other party to the contract] *expressly electing to adopt any such ... contract shall be deemed to ... constitute an election to adopt* or continue in force any such ... agreement or contract.

R. 10C, Ex. 19 at 8–9 (emphasis supplied). In spite of the explicit requirements of this order, there is nothing in the record suggesting that the Rock Island trustee assumed the Diamond Shamrock contracts in a written instrument delivered to Diamond Shamrock. Therefore, the district court concluded that TNW had not demonstrated that the trustee had properly assumed the Diamond Shamrock contracts. We agree. In addition, the district court properly noted that Diamond Shamrock's alleged awareness that TNW was purchasing trackage rights from Rock Island did not alter the fact that the "record lacks anything showing an express assumption by the Trustee in accordance with the mandates of order 1." Mem. op. at 14. Again, we conclude that the district court's interpretation of its own order should be accorded deference. *See* Part II.A *supra*. Because the Rock Island trustee failed properly to assume or adopt the Diamond Shamrock contracts before its attempt to assign those contracts to TNW, TNW cannot claim any rights under them.[9]

### Conclusion

The district court's judgment is affirmed. Order No. 443 and Order No. 519 left the question of title to the Section 399 right-of-way unresolved. In agreeing to accept

first a quitclaim deed and then a deed "without warranty of any kind," TNW accepted the risk that it might receive defective interests in the disputed right-of-way. In fact, Rock Island possessed no property interests or contract rights in Section 399 that it could validly convey to TNW. Therefore, Diamond Shamrock could lawfully bar TNW from access to its facilities in Section 399, and TNW's petition for relief was properly rejected by the district court.

AFFIRMED.

---

9. In its brief, TNW suggests several reasons why Rock Island's failure to comply with Order No. 1 ought not preclude the trustee's assignment of the contracts. For instance, TNW argues that the Rock Island trustee's failure to comply with the requirements of Order No. 1 did not preclude him from validly assigning the railroad's contracts since, under § 77(b)(5) of the former Bankruptcy Act, a *binding* assumption of an executory contract can only be made in a reorganization plan. Appellant's Br. at 33. In addition, TNW maintains that the Rock Island trustee routinely assigned the railroad's executory contracts in the ordinary course of administering the bankrupt estate through an Asset Disposition Program. The Rock Island/Diamond Shamrock contracts were assigned under this program in the same manner in which *all* contracts associated with the sale of railroad property were assigned. *Id.* at 35. TNW also suggests that Diamond Shamrock had notice of the trustee's assignment to TNW. Extensive discussion of these arguments is not warranted. None of the matters suggested by TNW excuses the Rock Island trustee from failing to comply with the specific procedures for the assumption and assignment of contracts established by the district court in Order No. 1.